IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| In re: | |
| **MERIDIAN RESTAURANTS UNLIMITED, LC,** a Utah limited liability company, | Bankruptcy Case No. 23-20731-KRA |
| | Chapter 11 |
| Tax ID No. 22-3863257, | Honorable Kevin R. Anderson |
| Debtor-in-Possession. | [Filed Electronically] |
| | |
| In re: | Bankruptcy Case No. 23-20732-KRA |
| **LOVELOUD RESTAURANTS, L.C.,** a Utah limited liability company, | Chapter 11 |
| Tax I.D. No. 87-3720443, | Honorable Kevin R. Anderson |
| Debtor-in-Possession. | [Filed Electronically] |
| | |
| In re: | Bankruptcy Case No. 23-20733-KRA |
| **AZM RESTAURANTS, L.C.,** a Utah limited liability company, | Chapter 11 |
| Tax I.D. No. 47-3131673, | Honorable Kevin R. Anderson |
| Debtor-in-Possession. | [Filed Electronically] |
| | |
| In re: | Bankruptcy Case No. 23-20736-KRA |
| **HR RESTAURANTS, L.C.,** a Utah limited liability company, | Chapter 11 |
| Tax I.D. No. 26-2114591, | Honorable Kevin R. Anderson |
| Debtor-in-Possession. | [Filed Electronically] |

| | |
|---|---|
| In re: | Bankruptcy Case No. 23-20737-KRA |
| **MR RESTAURANTS, L.C.**, a Utah limited liability company, | Chapter 11 |
| Tax I.D. No. 27-2405774, | Honorable Kevin R. Anderson |
| Debtor-in-Possession. | [Filed Electronically] |
| In re: | Bankruptcy Case No. 23-20738-KRA |
| **NDM RESTAURANTS, L.C.**, a Utah limited liability company, | Chapter 11 |
| Tax I.D. No. 47-1791172, | Honorable Kevin R. Anderson |
| Debtor-in-Possession. | [Filed Electronically] |
| In re: | Bankruptcy Case No. 23-20739-KRA |
| **NKS RESTAURANTS, L.C.**, a Utah limited liability company, | Chapter 11 |
| Tax I.D. No. 82-3393400, | Honorable Kevin R. Anderson |
| Debtor-in-Possession. | [Filed Electronically] |

## DECLARATION OF JAMES WINDER IN SUPPORT OF FIRST DAY RELIEF

I, James Winder, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury:

1.      I am the Managing Member, Board Member, and Chief Restructuring Officer of Meridian Restaurants Unlimited, LC ("Meridian") and its affiliated debtors and debtors in possession, Loveloud Restaurants, L.C. ("Loveloud"), AZM Restaurants, L.C. ("AZM"), HR

Restaurants, L.C. ("HR"), MR Restaurants, L.C. ("MR"), NDM Restaurants, L.C. ("NDM"), and

NKS Restaurants, L.C. ("NKS") (collectively, the "Debtors").

2.      The Debtors have their corporate offices at 5929 Fashion Point Drive, Suite 501,

South Ogden, Utah 84403.

3.      I submit this declaration (the "Meridian Declaration") to provide an overview of the

Debtors and their chapter 11 cases and to support the Debtors' applications and motions for "first-

day" relief.  I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and

books and records.  Except as otherwise indicated herein, all facts set forth in this Meridian

Declaration are based upon my personal knowledge of the Debtors' business operations and

finances, information learned from my review of relevant documents, information supplied to me by

Debtors' other management and employees or the Debtors' professional advisors, or my opinions

based on my experience, knowledge, and information concerning the Debtors' business operations

and finances.

4.      I am authorized to submit this Meridian Declaration on behalf of the Debtors and, if

called upon to testify, I could and would testify competently to the facts set forth herein.

5.      On March 2, 2023, (the "Petition Date"), the Debtors separately filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court

for the District of Utah (the "Court").

6.      The Debtors are authorized to operate their business and manage their properties as

debtors-in-possession under 11 U.S.C. §§ 1107(a) and 1108. No creditors' committee is appointed in

the Debtors' chapter 11 cases by the Office of the United States Trustee, nor has any trustee or

examiner been requested or appointed.

**Background of the Debtors and Business Operations**

**I.    Background of the Debtors' Business and Corporate Structure.**

7.    The Debtors constitute one of the largest current franchisees of Burger King restaurants.    The Debtors operate one-hundred sixteen (118) Burger King restaurants (the "Restaurants").    The Debtors operate the Restaurants in nine (9) states: Utah, Montana, Wyoming, North Dakota, South Dakota, Minnesota, Nebraska, Kansas, and Arizona.



8.    The Restaurants are operated by Debtors AZM, HR, MR, NDM, and NKS.    Other non-Burger King branded restaurants are operated by non-debtor subsidiaries of Meridian and Loveloud.

9.    Meridian is the sole member and 100% owner of Loveloud.    Loveloud is the sole member and 100% owner of MR, HR, NDM, NKS and AZM.    Attached hereto as **Exhibit 1** is a

corporate organizational chart for the Debtors and non-debtor affiliates.

10.    Copies of the written consents authorizing the filing of these chapter 11 cases by each of the Debtors is attached to their respective Petitions and incorporated by reference herein.

## II. The Debtors' Franchise Agreements and Leases.

11.    Each of the Restaurants is subject to its own Burger King Restaurant Franchise Agreement, license agreements, and other agreements, by and between Burger King Corporation ("BKC") and the applicable operating subsidiary Debtor, *i.e.*, Debtors AZM, HR, MR, NDM, and NKS (collectively, the "Franchise Agreements").[1]  Pursuant to the Franchise Agreements, the Debtors are granted the right to operate the Restaurants using the Burger King trademarks and service marks, and are provided certain operational support from BKC, in exchange for payment of certain royalties and advertising contributions to BKC in accordance with and subject to the terms and conditions of the Franchise Agreements.

12.    Each of the Restaurants is also subject to its own lease agreement (the "Lease Agreements") by and between the applicable subsidiary Debtor and the lessor of the property on which the Restaurant is located.  BKC is the landlord and lessee of some of the Restaurant properties.

13.    The Franchise Agreements and Lease Agreements are guaranteed by Meridian, Loveloud, and David Harper, who was the managing owner as of the date of the applicable franchise agreement.

## III. Other Prepetition Indebtedness.

_____

1  Certain restaurants in Minnesota were formerly operated under franchise agreements and now are operated under limited license agreements.

14.    The Debtors have estimated unsecured debt (excluding the unsecured claims of City National Bank as agent) in the aggregate amount of approximately $14 million as of the Petition Date.  There are amounts due to BKC pursuant to the Franchise Agreements and Lease Agreements for royalties, advertising contributions, rent, and other amounts owed to BKC. City National Bank previously held a perfected security interest against the Debtors' personal property assets, however each of its UCC-1 financing statements lapsed prior to the Petition Date and thus no longer holds valid security interest in the Debtor's personal property or cash collateral. Copies of the lapsed UCC-1 financing statements are attached hereto as **Exhibit 2**.  Accordingly, City National Bank is now an unsecured creditor. There are also amounts due to other landlords under the Lease Agreements. Certain more limited prepetition amounts are also owed to vendors.

## IV.  Circumstances Leading to Filing.

15.    It's been the prevailing belief of Meridian leadership for the past few months that restructuring obligations and assets would be the essential next step in fulfilling the Company's and employees' needs and objectives to operate sustainably in a post-pandemic environment. External pressures resulting from the pandemic including recent increases in wages (33% the past few years) and the cost of labor, shipping and food inflation (22% the past two years), decreased availability of labor,    and    inflation    generally    have    driven    the    Debtors'    cash    flow    issues.



Over the past several years, and particularly as a result of the COVID-19 pandemic, franchisees system-wide have experienced declining foot traffic. The Debtors' business has also suffered significantly from loss of foot traffic, resulting in declining revenue without proportionate decreases in rental obligations, debt service, and other liabilities. For many years, Meridian has had lower than the Burger King system average annual restaurant revenue volumes. The original founder acquired many underperforming restaurants with the unrealized objective to grow annual volumes. These lower volumes result in smaller profit margins and thus greater sensitivity to the recent dramatic rise in labor, commodity and maintenance costs. As a result, although certain of the Restaurants are profitable, others operate at a loss, and have for many years, resulting in the Debtors' inability to meet financial obligations timely. Notwithstanding macroeconomic challenges, Management has improved certain key leading indicators such as customer service scores and third party restaurant inspection scores. Such improvements are monitored closely by the franchisor and, in conjunction with the franchisor's increased marketing efforts, expected to drive Sales improvements. The team also believes there is opportunity to improve Gross Margin by 1-2%

through the reduction of waste and shrinkage. Management has also identified significant opportunities to improve Labor % as a cost of Sales. This combined with the restructuring of some assets and obligations will free up cash flow to support day to day operations and management objectives to become a healthy and thriving business.



**EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS**

16.     To minimize the adverse effects of filing for bankruptcy protection and to facilitate the restructuring of its financial affairs, the Debtors requested various types of "first-day" relief (collectively, the "First Day Motions") on an interim or final basis. The First Day Motions seek relief intended to allow the Debtors to operate as necessary and in sufficient capacity to meet and fulfill their duties as debtors-in-possession and other non-bankruptcy legal obligations.

17.     I am familiar with the contents of each First Day Motion and the exhibits thereto, and believe the relief sought in each First Day Motion is: (a) necessary to enable the Debtors to carry out

their duties and legal obligations in the chapter 11 cases; (b) critical to achieving a successful reorganization of the Debtors' business affairs on an expeditious basis; and (c) in the best interest of the Debtors' bankruptcy estates and creditors.  Additionally, and as set forth more fully below, I believe immediate entry of the relief requested in the First Day Motions is necessary and critical to the Debtors' financial restructurings, preserving the value of their business operations for the benefit of creditors, and achieving a successful reorganization of the Debtors' business affairs.

### A.  Motion for Expedited Hearing on First Day Motions

18.     On the Petition Date, the Debtor filed its *Ex Parte Motion for Order Shortening Time for Notice and the Hearing on First Day Motions* ("Expedited Hearing Motion").  In the Expedited Hearing Motion, the Debtors request the Court enter an Order shortening the time for notice of, the time to object to, and the hearing on certain First Day Motions – specifically, the Employee Wage Motion, Cash Management Motion, Motion for Joint Administration, and Prepetition Taxes Motion, each discussed below.

19.     I have reviewed each of these First Day Motions and I am familiar with the relief requested therein.  I believe shortened notice and an expedited hearing with respect to the entry of the relief sought in these First Day Motions is necessary to avoid immediate and irreparable harm to the Debtors, the estates, and creditors, and granting the relief requested in the First Day Motions in an expeditious manner is critical to minimizing the adverse effects on the Debtors of filing the chapter 11 cases and allowing for uninterrupted operations.  Most critically, the relief requested in the First Day Motions will allow the Debtors to pursue confirmation of a chapter 11 plan of reorganization quickly and efficiently while minimizing administrative costs.  Accordingly, I believe shortened notice and an expedited hearing for the Court's consideration of the First Day Motions is

necessary and critical to the Debtors' operations, preserving its value for the benefit of creditors, and achieving a successful reorganization.

**B. Motion for Joint Administration.**

20.     On the Petition Date, the Debtors filed the *Motion Requesting Joint Administration and Procedural (But Not Substantive) Consolidation of Related Chapter 11 Cases* (the "Motion for Joint Administration").

21.     In the Motion for Joint Administration, the Debtors seek entry of an order directing the joint administration of their chapter 11 cases and consolidation thereof for procedural purposes only, with all filings to take place in the case captioned In re Meridian Restaurants Unlimited, L.C., case no. 23-20731-KRA.

22.     Meridian is the sole member and 100% owner of Loveloud. Loveloud is the sole member and 100% owner of MR, HR, NDM, NKS and AZM. Attached hereto as **Exhibit 1** is a corporate organizational chart for the Debtors and non-debtor affiliates.

23.     The financial affairs and business operations of the Debtors are closely related. Accordingly, entry of an order directing joint administration of these cases will avoid duplicative notices, applications and orders, and will thereby save considerable time and expense for the Debtors and result in substantial savings to their estates. Moreover, I do not believe joint administration will adversely affect the Debtors' respective constituencies because the Motion for Joint Administration seeks only administrative, not substantive, consolidation of the Debtors' estates. Further, the rights of creditors and parties in interest will be enhanced by the reduced costs that will result from joint administration. The Court will also be relieved of the burden of hearing duplicative motions, entering duplicative orders, and maintaining duplicative files. Supervision of the administrative

aspects of these cases by the U.S. Trustee also will be simplified and streamlined.

24.     The Debtors also seek permission to use a combined service list and correspondingly combined notices.  The official mailing matrixes for all seven chapter 11 cases are substantively identical, and many of Meridian's filings will relate to all seven Debtors and would likely serve the same creditors and parties in interest.  Requiring the Debtors to serve seven separate copies of pleadings seeking the same relief as to all seven Debtors would be a substantial waste of estate resources and be to the detriment of the Debtors' creditors.

25.     For these reasons, I believe that the relief requested in the Motion for Joint Administration is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

**C. Cash Management Motion.**

26.     On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim Order Authorizing the Debtors to (A) Continue to Operate Their Cash Management System on an Interim Basis, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Setting a Final Hearing, and (E) Granting Related Relief* (the "Cash Management Motion").  In the Cash Management Motion, the Debtors seek authority to continue using its cash management system (the "Cash Management System"), bank account and business forms, and seek a waiver of certain Bankruptcy Code requirements and U.S. Trustee Guidelines imposed upon chapter 11 debtors-in-possession.

27.     The Debtors' Cash Management System is similar to the centralized cash management systems used by other comparably sized companies to manage cash flow.  The Debtors

use the Cash Management System in the ordinary course to receive, transfer and disburse funds and to facilitate payroll, operating expenses, taxes, cash monitoring, forecasting, and reporting. The Debtors' financial personnel manage the Cash Management System from the Debtors' headquarters in South Ogden, Utah, and implement cash management controls for entering, processing, and releasing funds. Additionally, the Debtors' corporate accounting personnel regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly. The Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds and allows the Debtors to accurately track cash flow on behalf of the entire business operation.[2]

28.    I believe that requiring the Debtors to close the pre-existing bank accounts in the Cash Management System would cause unnecessary disruption of Debtors' business operations and would likely prevent the Debtors from successfully reorganizing. A change in the Debtors' bank accounts could seriously damage the Debtors' cash position and interrupt cash flow, and may result in an unnecessary delay of funds and a shortage of cash flow necessary to operate the business and pay expenses as they come due. Therefore, I believe the continued use of the Debtors' pre-petition bank accounts and Cash Management System as described in the Cash Management Motion is imperative and will enable the Debtors to maintain its business operations with minimal disruption.

29.    In the Cash Management Motion, the Debtors propose to comply with the U.S. Trustee Guidelines by opening new debtor-in-possession bank accounts to make expense and payroll disbursements, while maintaining the currently existing bank accounts for collection of cash and

---

2  The income and expenses attributable to operations of the black bear diner owned by Meridian and two non-burger king restaurants partially owned by Loveloud, which are not debtors in these cases, are not commingled with the Cash

non-cash payments and revenue from the Restaurants.  In this scenario, all revenues and deposits would continue to flow into the existing bank accounts maintained by the Debtors, all revenue would be swept into new debtor-in-possession accounts and all future disbursements will be disbursed from the new debtor-in-possession accounts.  The Debtors also propose the allowance of their continued use of electronic transfer, debit, wire/ACH or other similar methods, instead of the U.S. Trustee Guidelines' required use of checks.  If the Debtors' ability to conduct transactions by debit, wire/ACH or other similar methods is impaired, the Debtors day-to-day activities may be unnecessarily disrupted, and their estates will incur additional costs.

30.     I believe the relief sought in the Cash Management Motion will allow the Debtors to maintain business operations while also comply with reporting requirements to the U.S. Trustee, the Bankruptcy Court, and creditors, and is in the best interests of the Debtors and the estates.  I believe the Debtors' continued use of their Cash Management System in this fashion will facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies, expenses, and distraction associated with disrupting this system and minimizing delays in the payment of postpetition obligations.

**D. Employee Wage and Benefit Motion.**

31.     On the Petition Date, the Debtors filed the *Motion for Entry of Order: (I) Authorizing, but not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries and Other Compensation (B) Continue Employee Benefits Programs and (II) Granting Related Relief* (the "Employee Wage Motion").

---

Management System used for the Debtors and their income and expenses.

32.    The Employee Wage Motion seeks authority to pay the Debtors' workforce of approximately 2,495 individuals (the "Employees") the wages, compensation, and benefits earned during the prepetition period (as set forth more specifically in the Employee Wage Motion), as well as to continue making such payments in the ordinary course of business.  Approximately 2,266 Employees are compensated on an hourly basis and there are approximately 229 Employees who receive a salary.  The majority of the Employees consist of the Debtors' part-time restaurant crew members.  The Employees also include restaurant general managers, restaurant managers, restaurant managers in training and shift leaders.

33.    The Debtors pay Employees every two weeks.  Payroll periods run Monday through Sunday for two weeks, and payroll is paid every other week on Friday.  As of the Petition Date, the Debtors will owe Employees approximately $1,331,175 in gross wages earned between Monday, February 20, 2023 and the Petition Date, to be paid on March 10, 2023 (the "Prepetition Payroll Obligations").  None of the amounts to be paid to any single Employee for this period will exceed the $15,150.00 priority cap in 11 U.S.C. § 507(a)(4).  The Debtors also seek entry of an order authorizing financial institutions to honor and process checks and payments those related to the Prepetition Payroll Obligations.

34.    The Debtors also maintain a number of performance-based incentive programs as well as recognition awards for their non-insider Employees (collectively, the "Employee Incentive Programs") and offer Employees the ability to participate in a number of insurance and benefits programs, including, among other programs, medical, prescription drug, dental, and vision plans, life insurance, workers compensation, accidental death and dismemberment insurance, disability

benefits, employee assistance programs, retirement plans, and paid time off (collectively, the "Employee Benefits Programs").

36.     Additionally, and as part of the Employee Benefits Programs, the Debtor is self-insured. The Debtor's health benefit claims are administered through third-party Employee Benefits Administration & Management and are routinely paid in the ordinary course of the Debtor's business.  As of the Petition Date, $394,972.37 in employee health benefit claims, which is less than $200.00 per Employee, have accrued and are owing.

36.     Additionally, the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities as required.  The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (the "Employer Payroll Taxes" and, together with the Employee Payroll Taxes, the "Payroll Taxes").  The necessary amounts for the Payroll Taxes are remitted by the Debtors to their payroll processor, who submits the filings and payments for federal, state and local taxes associated with payroll.

37.     As of the Petition Date, the Debtors estimate that they will have unpaid Payroll Taxes outstanding of approximately $201,525 which the Debtors will be required to fund and remit to their payroll processor on March 8, 2023.  As of the Petition Date, the Debtors estimate that they will have unpaid deductions, including deductions for including garnishments, child support, and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of health care benefits and insurance

premiums, 401(k) contributions, and other legally ordered deductions, outstanding of approximately $45,055 which would come due within the first 30 days of these chapter 11 cases (together with Payroll Taxes, the "Withholding Obligations").  Insofar as the Debtors believe such funds are held in trust for the taxing authorities, and are not property of the Debtors' estate, the Debtors request authority to transmit the Deductions and Payroll Taxes to the proper parties in the ordinary course.

38.      I believe a sound business justification exists for the relief sought in the Employee Wage Motion.  The Employees include personnel who are intimately familiar with the Debtors' business, processes, and systems, and possess unique skills and experience with the core business segments of the Debtors.  Many of these Employees have developed relationships with customers and vendors that are essential to the Debtors' business.  Without the continued, uninterrupted services of the Employees, I recognize that the Debtors' business operations will be halted and the administration of the estates materially impaired.

39.      I believe the Employees are vital to the Debtors' business operations and ability to operate as a debtors-in-possession during the pendency of these chapter 11 cases.  The Debtors' Employees rely on their wages and compensation to pay for housing, food, and energy.  Failure to pay the Employees their earned wages and compensation would result in substantial hardship to the Employees.  Additionally, I believe the failure to continue the Employee Benefits Programs could cause Employees to experience severe hardship, while the failure to continue the Employee Incentives Program would negatively impact morale and performance.   Under the best circumstances, the filing of a chapter 11 petition is a stressful and uncertain event for a debtor's employees.  Such stress and uncertainty may adversely affect employee morale at a time when a debtor is particularly vulnerable to business disruptions.  Low morale, and a perception that

employees are receiving less than favorable treatment, may result in many Employees seeking employment elsewhere, including from competitors of the Debtors.  Accordingly, honoring the Prepetition Payroll Obligations and continuing the Employee Incentive Programs and Employee Benefits Programs in the ordinary course of business without interruption will avoid any hardship to the Employees and encourage the Employees to continue their employment with the Debtors.

40.    I believe the Debtors' ability to satisfy the Prepetition Payroll Obligations at the outset of the chapter 11 case is also necessary and essential to the Debtors' continued operations. Loss of the Employees would have immediate negative impacts on the Debtors' ability to continue operations as a debtor-in-possession during chapter 11, and payment of the Prepetition Payroll Obligations would allow the Debtors to operate without interruption, continue to operate the business with minimal disruption, and proceed with the critical task of stabilizing operations and pursuing a successful chapter 11 reorganization and to preserve value for the estates.  Accordingly, the relief requested in the Employee Wage Motion is appropriate under the circumstances and necessary to avoid immediate and irreparable harm to the Debtors' business and prospects of reorganization under chapter 11.

**E.  Sales Taxes Motion.**

41.    On the Petition Date, the Debtors filed the *Motion for Entry of Order: (I) Authorizing, but not Directing, the Payment of Certain Prepetition Taxes and Fees; (II) Authorizing the Payment of Taxes and Fees in the Ordinary Course of Business; and (III) Granting Related Relief* (the "Prepetition Taxes Motion"). In the Prepetition Taxes Motion, the Debtors seek authority to, in their sole discretion, remit and pay prepetition Taxes and Fees to the appropriate Governmental

Authorities and to continue to pay such Taxes and Fees post-petition in the ordinary course of the Debtors' business.

42.     The Debtors collect, withhold, and incur and pay various taxes to taxing entities, including, but not limited to, sales taxes, use taxes, annual report, permit and licensing fees, real estate and personal property taxes, franchise taxes and fees, and various other governmental taxes, fees, and assessments (collectively, the "Taxes and Fees").  The Debtors then remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "Government Authorities").  The Debtors estimate that approximately $685,000 in Taxes and Fees relating to the prepetition period are or will become due and owing to the Governmental Authorities after the Petition Date in the ordinary course.

43.     The failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including: (a) the Government Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the administering the estate; (b) the Government Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that would harm the estates; and (c) the Debtors could be subject to penalties, the accrual of interest, or both.

44.     For these reasons, I believe that the relief requested in the Prepetition Taxes Motion is not only normal and customary in chapter 11 cases, but it is also in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**F.  BMC Retention Application**

45.     On or about the Petition Date, the Debtors filed its *Motion for Order Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. § 105(a) Approving Retention and Appointment of BMC Group, Inc.*

*as Noticing Agent and Granting Related Relief* (the "BMC Application"). In the BMC Application, the Debtors request the Court enter an order approving the retention and appointment of BMC Group, Inc. ("BMC") as noticing agent in the Debtors' chapter 11 cases.

46.    Given the complexity of the Debtors' chapter 11 cases, the potential number of claimants and parties requiring notice, employment of a noticing agent in the chapter 11 cases will relieve the Debtors and/or the Clerk of the Bankruptcy Court of the administrative burden of providing notice. BMC is well qualified to serve as noticing agent in this case and has significant experience in noticing and other administrative duties in chapter 11 cases. As set forth in the BMC Application, BMC will be compensated from the Debtors' bankruptcy estate pursuant to the requirements of 28 U.S.C. § 156(c).

47.    In connection with the filing of the chapter 11 cases, BMC has provided such services as noticing services related to the bankruptcy petition, schedules, statement of financial affairs, and other First Day Motions. Additionally, the Debtors have immediate and continuing obligations to provide further notice of pleadings and other events in the bankruptcy cases, and, accordingly, there is an immediate need for entry of an order authorizing BMC's retention and appointment as noticing agent. Therefore, I believe retention of BMC as noticing agent in the chapter 11 cases and the granting the relief sought in the BMC Application on an expedited basis is in the best interests of the estate, creditors, and other parties in interest.

### G.  Application to Employ Debtors' Counsel

48.    On or about the Petition Date, the Debtors filed the *Application to Employ Markus Williams Young & Hunsicker LLC as Co-Counsel for the Debtors-in-Possession*, as well as the *Application to Employ Ray Quinney & Nebeker P.C. as Co-Counsel for the Debtors-in-Possession*.

The Debtors seek to retain and employ Markus Williams Young & Hunsicker, LLC ("MWYH") and Ray Quinney & Nebeker ("RQN" and together with MWYH, the "Firms") as the Debtors' bankruptcy counsel to represent the Debtors and assist the Debtors in carrying out their duties and legal obligations in the chapter 11 cases.  On their behalf, the Firms will perform the following professional services:

      i.      Assist in the production of the Debtors' schedules and statements of financial affairs and other pleadings necessary to file the chapter 11 cases;

      ii.      Assist in the preparation of the Debtors' plan of reorganization and disclosure statement;

      iii.      Prepare on behalf of the Debtors all necessary applications, complaints, answers, motions, orders, reports, and other legal papers;

      iv.      Represent the Debtors in adversary proceedings and contested matters related to the Debtors' bankruptcy case;

      v.      Provide legal advice with respect to the Debtors' rights, powers, obligations and duties as chapter 11 debtors-in-possession in the continuing operation of the Debtors' business and the administration of the estates; and,

      vi.      Provide other legal services for the Debtors as necessary and appropriate for the administration of the Debtors' estates.

49.      The Debtors have selected the Firms by reason of their expertise and experience in bankruptcy matters and believes that the attorneys and staff of the Firms are well-qualified to represent the Debtors in the chapter 11 cases.  The Debtors believe the services that the Firms will render to Debtors are essential to Debtors' successful reorganization, and the services are necessary

to allow the Debtors to negotiate and implement the terms of their chapter 11 plan and, accordingly,

that the employment of the Firms is in the best interest of the creditors and the bankruptcy estate.  To

the best of the knowledge of the Debtors, the Firms are both "disinterested persons," as defined

under 11 U.S.C. § 101(14), and do not hold or represent any interest adverse to the Debtors' estates.

**H.  Peak Franchise Capital, LLC Retention Application**

50.    On or about the Petition Date, the Debtors also filed an *Application of the Debtors for*

*Entry of an Order Authorizing the Employment of Peak Franchise Capital, LLC, as Their Financial*

*Advisors* (the "PFC Application").  In the PFC Application, the Debtors request the Court enter an

order approving the retention and appointment of Peak Franchise Capital, LLC ("PFC") as financial

advisor for the Debtors in the chapter 11 cases.

51.    PFC has agreed to provide financial advisory services to the Debtors, including, but

not limited to the following: (a) review and advise the Debtors regarding financial statements,

financial models, confidential information memorandum and other necessary data; (b) review the

Debtors' debt agreements and leases, and provide advice related thereto; (c) provide guidance,

counsel and recommendations to the Debtors in developing a plan for the restructuring of certain

obligations of the Debtors, including creditors and the franchisor; (d) work with the Debtors in

business discussions, meetings and negotiations of a plan with the Debtors' secured creditors,

lessors, landlords, franchisor and vendors; and (e) work with legal counsel to appropriately

document all agreements and resolutions.

52.    The Debtors have selected PFC by reason of its expertise and extensive experience in

providing financial advisory services focused in the restaurant industry, including franchisor and

franchisee transactions and relationships.  Accordingly, I believe PFC has the necessary background

and training to deal effectively with financial and restructuring issues that may arise in the Debtors'

chapter 11 cases.  I believe that the professionals at PFC are well-qualified to assist and advise the

Debtors in the chapter 11 cases, and that the services to be rendered by PFC in the chapter 11 cases

are necessary and crucial to the Debtors achieving a successful restructuring and maximizing the

value of the bankruptcy estate for creditors and stakeholders.   The Debtors believe that the

employment of PFC as financial advisor in the Debtors' chapter 11 cases is in the best interest of the

creditors and the bankruptcy estate.


Dated: March 3, 2023                                    Respectfully submitted,


                                                        _____
                                                        James Winder
                                                        Managing Member & Board Member
                                                        Meridian Restaurants Unlimited, LC