| | |
|---|---|
| Michael R. Johnson (7070) | James T. Markus *(pro hac vice)* |
| David H. Leigh (9433) | William G. Cross *(pro hac vice)* |
| Elaine A. Monson (5523) | Lacey S. Bryan *(pro hac vice)* |
| **RAY QUINNEY & NEBEKER P.C.** | **MARKUS WILLIAMS YOUNG &** |
| 36 South State Street, 14th Floor | **HUNSICKER LLC** |
| Salt Lake City, Utah 84111 | 1775 Sherman Street, Suite 1950 |
| Tel: (801) 532-1500 | Denver, Colorado 80203-4505 |
| Email: mjohnson@rqn.com | Telephone (303) 830-0800 |
| Email: dleigh@rqn.com | Facsimile (303) 830-0809 |
| Email: emonson@rqn.com | Email: jmarkus@markuswilliams.com |
| | Email: wcross@markuswilliams.com |
| | Email: lbryan@markuswilliams.com |

*Proposed Counsel for the Debtor-In-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>MERIDIAN RESTAURANTS UNLIMITED, LC;<br>LOVELOUD RESTAURANTS, LC;<br>AZM RESTAURANTS, LC; HR<br>RESTAURANTS, LC; MR RESTAURANTS, LC;<br>NDM RESTAURANTS, LC; and<br>NKS RESTAURANTS, LC,<br><br>      Debtors-in-Possession. | Bankruptcy Case No. 23-20731-KRA<br>Bankruptcy Case No. 23-20732-KRA<br>Bankruptcy Case No. 23-20733-KRA<br>Bankruptcy Case No. 23-20736-KRA<br>Bankruptcy Case No. 23-20737-KRA<br>Bankruptcy Case No. 23-20738-KRA<br>Bankruptcy Case No. 23-20739-KRA<br><br>Chapter 11<br><br>Judge Kevin R. Anderson<br><br>**Jointly Administered Under**<br>**Bankruptcy Case No. 23-20731-KRA**<br><br>[Filed via ECF] |

## DEBTORS' MOTION AND MEMORANDUM IN SUPPORT OF SUBSTANTIVE CONSOLIDATION OF THE DEBTORS' JOINTLY ADMINISTERED CASES UNDER 11 U.S.C. § 105(a) *NUNC PRO TUNC* TO THE PETITION DATE

1

## MOTION

Debtors Meridian Restaurants Unlimited, L.C. ("Meridian"), Loveloud Restaurants, L.C. ("Loveloud"), AZM Restaurants, L.C. ("AZM"), HR Restaurants, L.C. ("HR"), MR Restaurants, L.C. ("MR"), NDM Restaurants, L.C. ("NDM"), and NKS Restaurants, L.C. ("NKS") (collectively, the "Debtors"), debtors and debtors-in-possession in the above-captioned jointly administered chapter 11 cases, by and through their undersigned proposed counsel, hereby file their *Debtors' Motion and Memorandum in Support of Substantive Consolidation of the Debtors' Jointly Administered Cases Under 11 U.S.C. § 105(a) Nunc Pro Tunc to the Petition Date* (the "Motion").  By and through this Motion, the Debtors respectfully move this Court for entry of an order, pursuant to the Court's equitable authority under 11 U.S.C. § 105(a), substantively consolidating the Debtors' jointly administered chapter 11 cases, *nunc pro tunc* to the date of filing of the Debtors' chapter 11 cases.[1]  In support of this Motion, the Debtors state as follows:

## MEMORANDUM IN SUPPORT

### Introduction

The Debtors have long operated as a consolidated single business enterprise.  The Debtors operate with a centralized management structure, with Loveloud, AZM, HR, MR, NDM, and NKS relying on management by Meridian, which controls the Debtors' revenue and pays operating expenses, vendor invoices, debt obligations, and payroll.  Further, the Debtors' cash and cash management is commingled on behalf of the entire enterprise and there are no separate bank accounts for the individual Debtors.  Tax returns have only been prepared and filed on a consolidated basis.  Additionally, the Debtors share a large magnitude of common creditors and shared debt obligations.  The Debtors' business operations, assets, liabilities, and financial affairs

---

[1] Alternatively, if the Court is unable or unwilling to order substantive consolidation as of the Petition Date, the Debtors request that substantive consolidation be ordered effective as of the date of filing of the Motion.

4864-3132-4759, v. 10

are so completely commingled and consolidated that unscrambling the Debtors' affairs is commercially infeasible; to the extent it is even possible, doing so would prove prohibitively costly and time consuming, undermine the Debtors' reorganization efforts, and threaten recoveries by creditors and parties in interest in the chapter 11 cases.  Accordingly, and for the reasons set forth below, the Debtors submit that the relief requested in the Motion is fully supported by the facts and circumstances of the Debtors' chapter 11 cases, the law of the Tenth Circuit, and the standards applicable to substantive consolidation of separate debtor entities into a single bankruptcy case.[2]

### Jurisdiction and Venue

1.     The United States Bankruptcy Court for the District of Utah has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The Motion is a court proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. § 1408 and 1409.  The statutory predicate for relief requested in the Motion is 11 U.S.C. § 105(a).[3]

### Background

**I.     The Debtors' Chapter 11 Cases.**

2.     On March 2, 2023 (the "Petition Date"), the Debtors separately filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Utah (the "Court").  The Debtors' chapter 11 cases are captioned as follows:

---

[2] In further support of the relief requested in the Motion, attached hereto as **Exhibit 1** is the *in Support of Substantive Consolidation* (the "Meridian Declaration"), which the Debtors hereby adopt and incorporate as if fully set forth herein.  Attached hereto as **Exhibit 2** is the *Declaration of Michael Elliott in Support of Substantive Consolidation* (the "Elliott Declaration"), which the Debtors hereby adopt and incorporate as if fully set forth herein.

[3] Unless otherwise specified, all references herein to "Section," "§," "Bankruptcy Code" and "Code" refer to the U.S. Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

- <u>In re Meridian Restaurants Unlimited, L.C.</u>, case no. 23-20731-KRA;

- <u>In re Loveloud Restaurants, L.C.</u>, case no. 23-20732-KRA;

- <u>In re AZM Restaurants, L.C.</u>, case no. 23-20733-KRA;

- <u>In re HR Restaurants, L.C.</u>, case no. 23-20736-KRA;

- <u>In re MR Restaurants, L.C.</u>, case no. 23-20737-KRA;

- <u>In re NDM Restaurants, L.C.</u>, case no. 23-20738-KRA;

- <u>In re NKS Restaurants, L.C.</u>, case no. 23-20739-KRA.

3.      On March 10, 2023, the Court entered its *Interim Order Authorizing and Directing the Joint Administration and Procedural (but not Substantive) Consolidation of Related Cases* [Dkt. 71, Case No. 23-20731-KRA] (the "<u>Joint Administration Order</u>") pursuant to which the Debtors' chapter 11 cases are jointly administered for procedural purposes only on an interim basis under <u>In re Meridian Restaurants Unlimited, LC</u>, Case No. 23-20731-KRA.

4.      The Debtors are authorized to operate their business and manage their properties as debtors-in-possession under §§ 1107(a) and 1108. On March 28, 2023, the Office of the United States Trustee appointed a single creditors' committee for all the Debtors.  No trustee or examiner has been requested by any party or appointed by the Court.

## II.      The Debtors' Business Operations.

5.      A description of the Debtors' business and the reasons for filing the chapter 11 cases are more fully described in the *Declaration of James Winder in Support of First Day Relief* (Dkt. No. 25) (the "<u>First Day Declaration</u>"), which the Debtors hereby adopt and incorporate as if fully set forth herein.

6.      The Debtors operate one hundred sixteen (116) Burger King franchise restaurants in nine states: Utah, Montana, Wyoming, North Dakota, South Dakota, Minnesota, Nebraska, Kansas, and Arizona. <u>Ex. 1</u>, *Meridian Declaration*, ¶ 13; <u>Ex. 2</u>, *Elliott Declaration*, ¶ 16.

4

Collectively, a total of one hundred eighteen (118) restaurants are operated or managed by Meridian, the other Debtors, and non-debtor affiliates. Ex. 1, *Meridian Declaration*, ¶ 14. However, only one hundred sixteen (116) of those restaurants are operated by the entities in the jointly administered chapter 11 cases (the "Restaurants"). Ex. 1, *Meridian Declaration*, ¶ 14. The Restaurants are operated by Debtors AZM, HR, MR, NDM, and NKS (collectively, the "Operating Debtors"). Ex. 1, *Meridian Declaration*, ¶ 15; Ex. 2, *Elliott Declaration*, ¶ 17.

7. Presently, and historically, the Debtors operate as a single business enterprise, relying on a centralized corporate structure and shared management, as well as a centralized cash management system and consolidated accounting and financial systems. Ex. 1, *Meridian Declaration*, ¶ 16; Ex. 2, *Elliott Declaration*, ¶ 18. The manner in which the Debtors operate the enterprise is common practice within the quick-serve restaurant industry with multi-unit, multi-company operators. Ex. 1, *Meridian Declaration*, ¶ 17; Ex. 2, *Elliott Declaration*, ¶¶ 19, 20.

A. The Debtors Have a Centralized Corporate Structure and Share Common Ownership.

8. As is common for many large multi-unit, multi-state operators within the quick-serve restaurant industry, the Debtors employ a centralized corporate structure and shared management structure designed to maximize the value of the entire enterprise. Ex. 1, *Meridian Declaration*, ¶ 18; Ex. 2, *Elliott Declaration*, ¶¶ 20, 31, 32.

9. The corporate structure used by the Debtors in their operations – centralized management of operating companies – is a standard and customary practice within the quick-serve restaurant industry for large multi-unit, multi-state operations. Ex. 1, *Meridian Declaration*, ¶ 19; Ex. 2, *Elliott Declaration*, ¶¶ 19-20, 30. Attached to the Winder Consolidation Declaration hereto as Exhibit 1-A is a corporate organizational chart for the Debtors and their non-debtor affiliates. Ex. 1, *Meridian Declaration*, ¶ 20.

10. The Debtors collectively maintain the same corporate offices at 5929 Fashion

Point Drive, Suite 501, South Ogden, Utah 84403. Ex. 1, *Meridian Declaration*, ¶ 21. All the employees at the Debtors' corporate offices in South Ogden, Utah, are employed by Meridian. *Id*. at ¶ 22.

11.     As reflected on the corporate organizational chart, Meridian owns one hundred percent (100%) of the membership interests in Loveloud. *Id*. at ¶ 23. Loveloud owns one hundred percent (100%) of the membership interests in the Operating Debtors. *Id*. at ¶ 24. Loveloud operates as a holding company for the Operating Debtors, who operate the Restaurants and generate all the revenue for the Debtors' business operations. *Id*. at ¶ 25. The Operating Debtors do not engage in any other operations other than operating the Restaurants. *Id*. at ¶ 29.

12.     While Meridian earns revenue or receives distributions from operations by non-debtor affiliates, that revenue is *de minimis* relative to the revenue generated by Restaurant operations. *Id*. at ¶ 26. In 2022, the combined gross sales for Meridian, the Debtors and non-client subsidiaries was $138,492,941.00. *Id*. at ¶ 27. The non-debtor entities MVP Restaurants L.C. ("MVP") and KBMH Restaurants, L.C. ("KBMH") accounted for $821,824 and $546,252, respectively, for a total of $1,368,076.00, or less than one percent (1%) of the total Meridian 2022 revenue. *Id*. at ¶ 28.

13.     Under the Debtors' centralized cash management system, all revenue generated at the Restaurants by the Operating Debtors is consolidated into accounts held by and in the name of Meridian, who in turn makes payments on behalf of itself, Loveloud, and the Operating Debtors for operating expenses, debt obligations, and payroll. Ex. 1, *Meridian Declaration*, ¶ 30; Ex. 2, *Elliott Declaration*, ¶¶ 21, 33, 41-67.

14.     The Debtors also share a common ownership structure. Ex. 1, *Meridian Declaration*, ¶ 31; Ex. 2, *Elliott Declaration*, ¶ 23. Meridian is owned by AGC Equity Partners

6

(20% ownership interest), David Harper (20% ownership interest), and PSCP Meridian, LLC

(60% ownership interest). Ex. 1, *Meridian Declaration*, ¶ 32.   PSCP Meridian LLC is the

managing member of Meridian.  Ex. 1, *Meridian Declaration*, ¶ 33; Ex. 2, *Elliott Declaration*, ¶

24.  James Winder is the manager for PSCP Meridian, LLC. Ex. 1, *Meridian Declaration*, ¶ 34;

Ex. 2, *Elliott Declaration*, ¶ 25.  The managing member of PSCP Meridian, LLC is Polar Star

Capital Partners. Ex. 1, *Meridian Declaration*, ¶ 35.  James Winder is the manager of Polar Star

Capital Partners. *Id*. at ¶ 36.

15.     James Winder executed Meridian's chapter 11 petition in his capacity as the

manager for PSCP Meridian, LLC, which is the managing member of Meridian. *Id*. at ¶ 37.

16.     James Winder executed the Loveloud chapter 11 petition in his capacity as the

managing member of Polar Star Capital Partners, the latter of which is the manager of PSCP

Meridian, LLC, the managing member of Meridian. *Id*. at ¶ 38.  Meridian owns one hundred

percent (100%) of the membership interests in Loveloud. *Id*. at ¶ 39.

17.     James Winder executed the chapter 11 petitions of the Operating Debtors in his

capacity as the managing member of Polar Star Capital Partners, the latter of which is the

manager of PSCP Meridian, LLC, which is the manager of Meridian, which is the managing

owner of Loveloud. *Id*. at ¶ 40.  Loveloud is the sole member and 100% owner of the Operating

Debtors. *Id*. at ¶ 41.

18.     While subsidiaries or affiliated operating entities are separate legal entities from

the parent company, it is common in the quick-serve restaurant industry for franchisees to treat

the separate subsidiary entities as regional or geographic divisions of a larger, consolidated

enterprise. *Id*. at ¶ 42.  The Debtors' business operates based on this common industry model for

large multi-unit, multistate operations, and has done so since prior to current ownership and

7

current management's involvement with the business. <u>Ex. 1</u>, *Meridian Declaration*, ¶ 43; <u>Ex. 2</u>, *Elliott Declaration*, ¶¶ 19,20.

B. <u>The Debtors' Utilize a Shared Management Structure.</u>

19.     While the Debtors are separate legal entities, Meridian manages the Debtors, with all executive-level employees being at the Meridian level. <u>Ex. 1</u>, *Meridian Declaration*, ¶ 44; <u>Ex. 2</u>, *Elliott Declaration*, ¶¶ 26-29.   Meridian employs a corporate staff of management, financial, human resources, and other personnel to manage the Debtors' operations on a system-wide basis. <u>Ex. 1</u>, *Meridian Declaration*, ¶ 45; <u>Ex. 2</u>, *Elliott Declaration*, ¶ 27.   These personnel make management decisions for Meridian, Loveloud, and the Operating Debtors. <u>Ex. 1</u>, *Meridian Declaration*, ¶ 46; <u>Ex. 2</u>, *Elliott Declaration*, ¶ 28.   Meridian personnel handle cash management, payroll, vendor contracting and payments, accounting, administrative services, and other matters for all of the Debtors' sole corporate offices in South Ogden, Utah. <u>Ex. 1</u>, *Meridian Declaration*, ¶ 47; <u>Ex. 2</u>, *Elliott Declaration*, ¶ 29.

20.     All the Debtor entities benefit from the shared management structure through consolidation of the Debtors' physically spread-out operations which allows for operational efficiency and cost effectiveness. <u>Ex. 1</u>, *Meridian Declaration*, ¶ 48; <u>Ex. 2</u>, *Elliott Declaration*, ¶ 31.   The one hundred sixteen (116) Restaurants are in nine states: Utah, Montana, Wyoming, North Dakota, South Dakota, Minnesota, Nebraska, Kansas, and Arizona. <u>Ex. 1</u>, *Meridian Declaration*, ¶ 13; <u>Ex. 2</u>, *Elliott Declaration*, ¶ 16.   The centralized management offsets the idiosyncrasies of the various geographies, local markets, and local operations of the operating entities and Restaurants. <u>Ex. 1</u>, *Meridian Declaration*, ¶ 49.   The consolidation of the Debtors' corporate structure, management, and business operations allows the Debtors to weather issues better than if operations were conducted by the operating entities separately. *Id*. at ¶ 50.   This

8

structure also allows the entire enterprise to benefit from scaled operations and reduces administrative costs as a percentage of revenue. Ex. 1, *Meridian Declaration*, ¶ 51; Ex. 2, *Elliott Declaration*, ¶ 32.

### C.  The Debtors Utilize a Consolidated Cash Management System.

21.    The Debtors utilize a centralized cash management system in the ordinary course to receive, transfer and disburse funds and to facilitate payroll, operating expenses, taxes, cash monitoring, forecasting, and reporting for the Debtors on a system-wide basis. Ex. 1, *Meridian Declaration*, ¶ 52; Ex. 2, *Elliott Declaration*, ¶ 33-40.   Attached to the Meridian Declaration hereto as Exhibit 1-B is a chart reflecting the Debtors' cash management system.   Ex. 1, *Meridian Declaration*, ¶ 53.

22.    The centralized cash management system implemented by the Debtors is a standard and customary practice within the quick-serve restaurant industry for large multi-unit, multi-state operations and has been the Debtors' historical practice. Ex. 1, *Meridian Declaration*, ¶ 54; Ex. 2, *Elliott Declaration*, ¶¶ 35, 55.  The Debtors' centralized cash management system is commercially necessary to support its obligations; operating separate cash management systems for each Debtor would not be economically feasible. Ex. 1, *Meridian Declaration*, ¶ 55; Ex. 2, *Elliott Declaration*, ¶ 36.  Further, this common industry practice prevents mismanagement of numerous accounts and transactions through focused controls in one centralized system is more cost effective and reduces exposure to fraud or accounting errors inherent in more de-centralized systems. Ex. 1, *Meridian Declaration*, ¶ 56; Ex. 2, *Elliott Declaration*, ¶ 37.

23.    The Debtors' centralized cash management system is managed and operated by personnel at and employed by Meridian. Ex. 1, *Meridian Declaration*, ¶ 57; Ex. 2, *Elliott Declaration*, ¶ 38.   Meridian financial and administrative departments manage the cash management system from the Debtors' headquarters in South Ogden, Utah, and implement cash

management controls for entering, processing, and releasing funds. Ex. 1, *Meridian Declaration*, ¶ 58; Ex. 2, *Elliott Declaration*, ¶ 39.   Additionally, Meridian accounting personnel regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly and accurately. Ex. 1, *Meridian Declaration*, ¶ 59; Ex. 2, *Elliott Declaration*, ¶ 40.

> (a) *The Revenue Generated from Restaurant Operations is Consolidated and Commingled into Accounts Held and Managed by Meridian.*

24.    Cash and other non-cash forms of payment received at the Debtors' Restaurants is deposited or credited into one of two collections accounts in the name of Meridian. Ex. 1, *Meridian Declaration*, ¶ 60; Ex. 2, *Elliott Declaration*, ¶ 41.   Cash received from customers at each Restaurant is deposited into Smart Safes in each Restaurant. Ex. 1, *Meridian Declaration*, ¶ 61; Ex. 2, *Elliott Declaration*, ¶ 42.   The Smart Safes in each Restaurant transmit the deposited cash to Wells Fargo Bank ("Wells Fargo"), and the bank then credits the Meridian Operating account, *6210, at Wells Fargo Bank (the "Wells Operating Account"). Ex. 1, *Meridian Declaration*, ¶ 62; Ex. 2, *Elliott Declaration*, ¶ 43.   Neither the Restaurants nor the Operating Debtors maintain their own bank accounts for collection of cash at the Restaurants or distributions for payment of expenses, debt obligations, or employee payroll. Ex. 1, *Meridian Declaration*, ¶ 63; Ex. 2, *Elliott Declaration*, ¶ 44.   The cash revenue received at each Restaurant is not segregated based on the Restaurant or the operating entity – instead, *all* cash revenue is commingled into the Wells Operating Account. Ex. 1, *Meridian Declaration*, ¶ 64; Ex. 2, *Elliott Declaration*, ¶ 45.

25.    Once a week, Garda World (armored transport) picks up the cash deposits from the Restaurants and delivers them to Wells Fargo to reconcile against the transmitted deposits. Ex. 1, *Meridian Declaration*, ¶ 65; Ex. 2, *Elliott Declaration*, ¶ 46.   Each day, financial personnel at Meridian electronically transfer funds from the Wells Operating Account to an

account at Zions Bank, Deposit account, *1415 (the "Zions Deposit Account") (together with the Wells Operating Account, the "Collections Accounts"). Ex. 1, *Meridian Declaration*, ¶ 66; Ex. 2, *Elliott Declaration*, ¶ 47.   The Zions Deposit Account is also in the name of and under the control of Meridian; cash revenue transferred into the Zions Deposit Account is not segregated by Restaurant or Operating Debtor but is commingled together. Ex. 1, *Meridian Declaration*, ¶ 67; Ex. 2, *Elliott Declaration*, ¶ 48.   The Collections Accounts are managed solely by financial personnel at Meridian. Ex. 1, *Meridian Declaration*, ¶ 68; Ex. 2, *Elliott Declaration*, ¶ 49.

26.     Amounts received from customers at the Restaurants via non-cash forms of payment – *i.e.*, credit and debit card payments – are credited directly to the Zions Deposit Account, within three to five days after the non-cash transactions are made at the Restaurant. Ex. 1, *Meridian Declaration*, ¶ 69; Ex. 2, *Elliott Declaration*, ¶ 50.   Thus, all cash and non-cash revenue received at the Restaurants flows into the Collections Accounts managed by and in the name of Meridian; the Operating Debtors do not utilize their own bank accounts for collection of cash and non-cash payments. Ex. 1, *Meridian Declaration*, ¶ 70; Ex. 2, *Elliott Declaration*, ¶ 51.   Like cash revenue received at each Restaurant, non-cash revenue is not segregated based on the Restaurant or Operating Debtor but is commingled into the Wells Operating Account. Ex. 1, *Meridian Declaration*, ¶ 71; Ex. 2, *Elliott Declaration*, ¶ 52.

27.     It has been the Debtors' historical practice to prepare consolidated financial statements and consolidated tax returns. Ex. 1, *Meridian Declaration*, ¶ 72; Ex. 2, *Elliott Declaration*, ¶ 55.   It has been the Debtors' historical accounting and financial practice to report and operate on a consolidated basis.   Ex. 1, *Meridian Declaration*, ¶ 73; Ex. 2, *Elliott Declaration*, ¶ 55.

*(b) Disbursements for the Debtors' Expenses, Payroll, and Other Obligations are Made by Meridian for the Entire Enterprise.*

28.     Under the Debtors' current cash management system, in addition to the Zions Deposit Account, Meridian also maintains two other bank accounts at Zions Bank: Disbursement Checking account, *2126 (the "<u>Zions Disbursement Account</u>"); and Payroll Checking account, *2118 (the "<u>Zions Payroll Account</u>"). <u>Ex. 1</u>, *Meridian Declaration*, ¶ 74; <u>Ex. 2</u>, *Elliott Declaration*, ¶ 56. Once transferred into the Zions Disbursement Account or the Zions Payroll Account, funds are not segregated by payee or Debtor but are commingled together to be used by Meridian to pay the expenses and payroll of all the Debtors. <u>Ex. 1</u>, *Meridian Declaration*, ¶ 75; <u>Ex. 2</u>, *Elliott Declaration*, ¶ 57.

29.     Revenue from operations of the Restaurants is transferred by Meridian from the Collections Accounts into the Zions Disbursement Account to pay general and administrative expenses, operating expenses, debt payments, utilities, and taxes for each of the Debtors. <u>Ex. 1</u>, *Meridian Declaration*, ¶ 76; <u>Ex. 2</u>, *Elliott Declaration*, ¶ 58. Invoices from the Debtors' vendors may be billed to an individual Restaurant, one of the Operating Debtors, or Meridian; however, all vendor invoices, regardless of who is billed, are paid by Meridian. <u>Ex. 1</u>, *Meridian Declaration*, ¶ 77; <u>Ex. 2</u>, *Elliott Declaration*, ¶ 59. Additionally, all expenses, utilities, taxes, lease payments, and debt obligations owed by any of the Debtors are paid by Meridian from the Zions Disbursement Account. <u>Ex. 1</u>, *Meridian Declaration*, ¶ 78; <u>Ex. 2</u>, *Elliott Declaration*, ¶ 60. In other words, Restaurant revenue is pooled and commingled and then used to pay the combined expenses and obligations of Meridian, Loveloud, and the Operating Debtors. <u>Ex. 1</u>, *Meridian Declaration*, ¶ 79; <u>Ex. 2</u>, *Elliott Declaration*, ¶ 61. This centralized system for payment of the Debtors' expenses by Meridian has been the Debtors' practice for at least the last four (4) years, and as long as current Meridian management has been in place. <u>Ex. 1</u>, *Meridian*

*Declaration*, ¶ 80.

30.     Similarly, Restaurant revenue commingled into the Zions Payroll Account is used to pay the payroll obligations of Meridian, Loveloud, and the Operating Debtors. Ex. 1, *Meridian Declaration*, ¶ 81; Ex. 2, *Elliott Declaration*, ¶¶ 62, 63.   Revenue from operations of the Restaurants is transferred by Meridian from the Collections Accounts into the Zions Payroll Account to pay the Debtors' employees' wages, benefits, and withholding payments, including, but not limited to, federal, state, and local income taxes, Social Security and Medicare taxes. Ex. 1, *Meridian Declaration*, ¶ 82; Ex. 2, *Elliott Declaration*, ¶ 63.   The Debtors contract with Paylocity, a third-party payroll processor, to facilitate payroll to employees; the master agreement with Paylocity was entered into by Meridian on behalf of itself and the other Debtors and was executed by Meridian's Director of Treasury & Accounting. Ex. 1, *Meridian Declaration*, ¶ 83; Ex. 2, *Elliott Declaration*, ¶ 64.   Meridian financial personnel submit payroll to Paylocity for all the Debtors; Loveloud and the Operating Debtors do not separately fund payroll amounts to Paylocity. Ex. 1, *Meridian Declaration*, ¶ 84; Ex. 2, *Elliott Declaration*, ¶ 65. While the employees receive checks showing the name of the Debtor who employs them (*i.e.*, Restaurant employees of NKS receives a check from NKS), all employees of the Debtors are paid via the Zions Payroll Account from funds controlled by Meridian. Ex. 1, *Meridian Declaration*, ¶ 85; Ex. 2, *Elliott Declaration*, ¶ 66.   This centralized system for payment of the Debtors' payroll by Meridian is operated at the Meridian level by Meridian employees and has been the Debtors' practice for at least the last four (4) years and as long as current Meridian management has been in place. Ex. 1, *Meridian Declaration*, ¶ 86.

31.     On average, each month there are approximately one hundred fifty thousand (150,000) transactions within the Debtors' consolidated cash management system through the

Collections Accounts, Zions Disbursement Account, and Zions Payroll account controlled and managed by Meridian. Ex. 1, *Meridian Declaration*, ¶ 87.

    D.   The Debtors' Centralized Cash Management System Generates Intercompany Balances Between and Among the Debtors.

    32.    As discussed above, all cash and non-cash revenue from Restaurant operations is collected and commingled into accounts held by Meridian, and used by Meridian to pay the expenses, payroll, and other obligations of all the Debtors. *Id*. at ¶ 88.  As a result, it is a regular and customary practice that all revenues of the Debtors is pooled and then this comingled pool of funds is used to pay the expenses of the consolidated enterprise, including, but not limited to, payment of general and administrative expenses, maintenance, purchases of food and beverage inventory, payment of utilities and other operating expenses, payment of wages and salaries for employees, and servicing of debt.  *Id*. at ¶ 89.

    33.    The by-product of the Debtors' consolidated operations, collection of revenues, and payment of expenses is that intercompany balances exist between and among the Debtors. (collectively, the "Intercompany Balances"). *Id*. at ¶ 90.  It is not accurate to call the Intercompany Balances liabilities, debts, or claims between the Debtors. *Id*. at ¶ 91.  The Debtors, like other consolidated franchise operations, do not consider such balances to cause debtor-creditor relationships where there is common ownership among entities. *Id*. at ¶ 92.  It is not customary in the industry to treat the intercompany balances as debts when the entities have common ownership and consolidated operations similar to the Debtors. *Id*. at ¶ 93.  There are no agreements between or among the Debtors creating debtor-creditor relationships based on the Intercompany Balances, and the Debtors' accounting and financial reporting does not reflect or create debtor-creditor relationships among them based on the Intercompany Balances. *Id*. at ¶ 94.

    34.    The Intercompany Balances are a by-product of the Debtors' ordinary course of

business operations. Ex. 1, *Meridian Declaration*, ¶ 95.  While the Intercompany Balances can be tracked, due to the Debtors' common ownership structure and single enterprise operations, the Intercompany Balances are not a metric used in the Debtors' internal operations or reporting to third parties. *Id*. at ¶ 96.  Moreover, because the Intercompany Balances are not liabilities, debts, or claims between the Debtors, there is no basis for any Debtor to assert a claim against another Debtor based on the Intercompany Balances. *Id*. at ¶ 97.

35.     The Debtors do not believe that the Intercompany Balances should be treated as either debt or equity for the reasons set forth above. *Id*. at ¶ 98.  Instead, the Intercompany Balances merely reflect transactions involving what is, in reality, a single, consolidated enterprise. *Id*. at ¶ 99.  However, if characterization of the Intercompany Balances is required, it would be more appropriate in the Debtors' views to characterize them as equity. *Id*. at ¶ 100. *See In re Tronox Inc.*, 503 B.R. 239, 293 (Bankr. S.D.N.Y. 2013) ("Kerr-McGee's Controller testified that Kerr-McGee's policy was to convert intercompany accounts to equity as a matter of practice when its subsidiaries were unable to repay intercompany balances.  It is appropriate to treat this intercompany balance, if it existed, as equity rather than debt.").

E.     The Debtors Utilize a Consolidated Accounting System to Track and Report the Business's Assets, Income, and Liabilities.

36.     In the ordinary course of the Debtors' business operations, the Debtors' balance sheets, statements of operations, statements of members' equity, and statements of cash flows are prepared on a consolidated basis. Ex. 1, *Meridian Declaration*, ¶ 101; Ex. 2, *Elliott Declaration*, ¶¶ 68-72. The consolidated financial statements include the accounts of Meridian, Loveloud, and the Operating Debtors. Ex. 1, *Meridian Declaration*, ¶ 102; Ex. 2, *Elliott Declaration*, ¶ 69.  The consolidated financial statements also include the accounts of Meridian's wholly owned non-

debtor subsidiary BBM Restaurants, LC, ("BBM") as well as Meridian's equity interests in non-debtors KBMH and MVP.[4] Ex. 1, *Meridian Declaration*, ¶ 103; Ex. 2, *Elliott Declaration*, ¶ 70.

37.     Additionally, the Debtors file consolidated income tax returns. Ex. 1, *Meridian Declaration*, ¶ 105; Ex. 2, *Elliott Declaration*, ¶ 71. The Debtors' consolidated tax returns do not break out the amount of income, gross receipts, sales, gross profit, ordinary business income (loss), deductions, depreciation, and other items on an individual entity basis; the amount of each of those items is reported as earned (or lost) by the entire consolidated enterprise. Ex. 1, *Meridian Declaration*, ¶ 106; Ex. 2, *Elliott Declaration*, ¶ 72.

F.     The Debtors' Common Creditors and Shared Liabilities.

38.     The Debtors also share a substantially common debt structure and common creditors. Ex. 1, *Meridian Declaration*, ¶ 107. A majority of the Debtors' unsecured debt obligations are jointly and severally owed to common creditors or have been guaranteed by the Debtors. *Id*. at ¶ 108.

39.     The Debtors estimate that the aggregate amount of general unsecured debt owed by all Debtors as of the Petition Date is approximately $64,733,225.[5] *Id*. at ¶ 109. Of that amount, the Debtors estimate that approximately $52,495,130, or 81% of the aggregate amount of unsecured debt, is owed to two creditors – City National Bank/Bridge Funding Group ("CNB") and Burger King Corporation ("BKC"). *Id*. at ¶ 110.

40.     Among the Debtors' estimated aggregate unsecured debt, an amount in excess of

---

[4] While the non-debtor affiliates BBM, KBMH and MVP are also managed by Meridian and included in the Debtors' consolidated financial statements, these entities maintain their own separate bank accounts and their revenue is not commingled with the revenue earned from the Restaurants operated by the Operating Debtors. Ex. 1, *Meridian Declaration*, ¶ 104.

[5] This amount includes the Debtors' obligations, totaling approximately $4 million, under tax payment agreements entered into with certain taxing entities prior to the Petition Date.  The Debtors intend to file motions to assume these agreements.

$50,000,000 is claimed by CNB to be owed as of the Petition Date.[6] Ex. 1, *Meridian Declaration*, ¶ 111.  CNB previously held a perfected security interest against the Debtors' personal property assets; however, each of CNB's UCC-1 financing statements lapsed prior to the Petition Date. *Id*. at ¶ 112.  Therefore, CNB no longer holds valid security interest in the Debtor's personal property or cash collateral.  Accordingly, CNB is now an unsecured creditor.

41.      The Debtors are each jointly and severally liable on this obligation to CNB. *Id*. at ¶ 113.  The Operating Debtors are primarily obligated on the unsecured debt owed to CNB, and Meridian and Loveloud are guarantors of that debt. *Id*. at ¶ 114. Meridian has paid the debt obligations to CNB from commingled revenue earned from Restaurant operations. *Id*. at ¶ 115.

42.      The amount CNB claims is owed represents approximately 76% of the Debtors' aggregate unsecured debt obligations. *Id*. at ¶ 116.

43.      Prior to the Petition Date, the Debtors were sued by CNB in the State of California for enforcement of the Debtors' obligations to CNB.[7] *Id*. at ¶ 117.  In that lawsuit, CNB seeks to recover in excess of $50,000,000 loaned to the Operating Debtors and guaranteed by Meridian and Loveloud. *Id*. at ¶ 118.

44.      The Debtors also owe common unsecured obligations to BKC. *Id*. at ¶ 119.  Each of the Restaurants is subject to its own Burger King Restaurant Franchise Agreement, license agreements, and other agreements, by and between BKC and the applicable Operating Debtor (collectively, the "Franchise Agreements"). *Id*. at ¶ 120.  Each of the Restaurants is also subject to its own lease agreement (the "Lease Agreements") by and between the applicable Operating

---

[6] Nothing contained herein is or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim on any grounds, or a promise to pay any claim against the Debtors.

[7] City National Bank, as Administrative Agent for City National Bank and Bridge Funding Group, Inc. v. NKS Restaurants, L.C., *et al.*, case no. 2:23-cv-00099 (C.D. Cal.).

4864-3132-4759, v. 10

Debtor and the lessor of the property on which the Restaurant is located; BKC is the landlord and lessee of some of the Restaurant properties. Ex. 1, *Meridian Declaration*, ¶ 121.  Regardless of which Operating Debtor is obligated on a Lease Agreement, payment to the landlord is made by Meridian. *Id*. at ¶ 122.

45.     There are amounts due to BKC pursuant to the Franchise Agreements and Lease Agreements for royalties, advertising contributions, rent, and other amounts owed to BKC by the applicable Operating Debtor. *Id*. at ¶ 123.  The Franchise Agreements and Lease Agreements, and amounts due thereunder, are guaranteed by Meridian, Loveloud, and David Harper, who was the managing owner as of the date of the applicable Franchise Agreements. *Id*. at ¶ 124.

46.     As of the Petition Date, the Debtors estimate that approximately $3,431,175 is owed by the Operating to BKC under the Franchise Agreements and Lease Agreements, which amounts are guaranteed by Meridian and Loveloud.[8] *Id*. at ¶ 125.  The estimated amount of the Debtors' obligations to BKC as of the Petition Date represents approximately 5% of the Debtors' aggregate unsecured debt obligations. *Id*. at ¶ 126.

47.     Prior to the Petition Date, the Debtors were sued by BKC in the Circuit Court of the Eleventh Judicial Circuit in and for the Miami-Dade County, Florida.[9] *Id*. at ¶ 127.  In that lawsuit, BKC seeks money damages against the Debtors for breaches of Franchise Agreements and Lease Agreements with BKC in relation to operating of Restaurants in Utah, Montana, Wyoming, Minnesota, South Dakota, Kansas, Arizona, and North Dakota. *Id*. at ¶ 128.  BKC seeks damages against Meridian, Loveloud, and David Harper based on their guarantees to BKC

---

[8] Nothing contained herein is or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim on any grounds, or a promise to pay any claim against the Debtors.

[9] Burger King Company, LLC v. NDM Restaurants, L.C., et al., case no. 2023-002323-CA-01.

of performance of the Franchise Agreements and Lease Agreements. Ex. 1, *Meridian Declaration*, ¶ 129.

48.     In addition to CNB and BKC, the Debtors also share a number of other common creditors. *Id*. at ¶ 130.   For example, one of the Debtors' largest equipment lessors is VFI Corporate Finance ("VFI"). *Id*. at ¶ 131.   VFI leases equipment that is used as part of the operations for all of the Debtors. *Id*.   Meridian is the lessee on the lease, and Loveloud is a guarantor of the lease. *Id*.   Further, on many (but not all) of the leases where BKC is not the landlord, Meridian or Loveloud has guaranteed the lease. *Id*. at ¶ 132.   The Debtors also share obligations to for general and administrative expenses, various vendors for food and inventory, and utilities. *Id*. at ¶ 133.

## Basis for the Relief Requested in the Motion

**I.     Substantive Consolidation of the Debtors' Chapter 11 Cases is Appropriate.**

A. The Court Has Authority Under 11 U.S.C. § 105(a) to Order the Substantive Consolidation of the Debtors.

49.     There is no provision in the Bankruptcy Code expressly authorizing a bankruptcy court to approve substantive consolidation of separate debtor entities into a single bankruptcy case.   "The majority of courts, including the Tenth Circuit, recognize that bankruptcy courts have the authority to substantively consolidate bankruptcy cases pursuant to their general equitable powers" under § 105(a). *SE Prop. Holdings, LLC v. Stewart (In re Stewart)*, 571 B.R. 460, 469 (Bankr. W.D. Okla. 2017) (citing *Fish v. East*, 114 F.2d 177 (10th Cir. 1949) (analyzing substantive consolidation under the Bankruptcy Act); also citing *Federal Deposit Insurance Corp. v. Hogan (In re Gulfco Investments Corp.)*, 593 F.2d 921, 928 (10th Cir. 1979) (same)). The power to substantively consolidate debtor entities into a single bankruptcy case has been widely accepted under the Bankruptcy Code, including by this Court. *See, e.g., In re The Falls*

*Event Center LLC*, 600 B.R. 857 (Bankr. D. Utah 2019); *In re Thrive Nat'l Corp.*, 2018 Bankr. LEXIS 1501, at 13-14 (Bankr. D. Utah May 21, 2018); *In re Castle Arch Real Estate Inv. Co., LLC*, 2013 Bankr. LEXIS 532, at *55 (Bankr. D. Utah Feb. 8, 2013); *In re George Love Farming, LC*, 366 B.R. 170, 180 (Bankr. D. Utah 2007); *In re Horsley*, 2001 Bankr. LEXIS 1156, at *12 (Bankr. D. Utah Aug. 17, 2001); *In re Dee Allen Randall*, Case No. 10-37546-JTM Dkt. No. 449 (Bankr. D. Utah Jan. 30, 2012).

50.     As stated by Judge Thurman in the *George Love Farming* case:

When a court substantively consolidates bankruptcy estates, the effect is to pierce the several corporate veils and to disregard the existence of the separate corporate entities.  The result is the creation of one common pool of assets, liabilities and a single body of creditors, while extinguishing the intercorporate liabilities of the consolidated entities.  Substantive consolidation treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities.

*In re George Love Farming, LC*, 366 B.R. at 179-80 (internal quotations and citations omitted).

51.     Further, as noted by Judge Mosier in *The Falls Event Center*, if substantive consolidation is ordered, "[t]he result is that 'claims of creditors against separate debtors morph to claims against the consolidated survivor.'"  *In re The Falls Event Center LLC,* 600 B.R. at 867 (quoting *In re Owens Corning, Inc.,* 419 B.R. 195, 205 (3d Cir. 2005)).

52.     In *Fish* and *Gulfco*, the Tenth Circuit recognized that substantive consolidation may be employed in appropriate circumstances, and the Court set forth ten factors to consider in a substantive consolidation analysis:

(1) The parent corporation owns all or majority of the stock of the subsidiary;

(2) The parent and subsidiary corporations have common directors or officers;

(3) The parent corporation finances the subsidiary;

(4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation;

4864-3132-4759, v. 10

(5) The subsidiary has grossly inadequate capital;

(6) The parent corporation pays the salaries or expenses or losses of the subsidiary;

(7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation;

(8) In the papers of the parent corporation, and in the statements of its officers, the subsidiary is referred to as such or as a department or division;

(9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; and

(10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

*Fish*, 114 F.2d at 191; *Gulfco*, 593 F.2d at 928-29.

53. In *Horsley*, Judge Judith Boulden (Ret.) noted that "[t]he *Gulfco/Fish* criteria can be reduced into two general components: (1) the extent to which the entity to be substantively consolidated was managed or controlled by the debtor, and (2) whether the entity to be substantively consolidated had an economic existence independent from the [d]ebtor." *In re Horsley*, 2001 Bankr. LEXIS 1156 at *12-13. Additionally, under *Gulfco*, substantive consolidation may be appropriate where the assets of the entities are "hopelessly commingled" or where difficult accounting problems caused by intercompany debt are "so strong that the great expense (in order to bring about an unscrambling) threaten[s] recovery." *Gulfco*, 593 F.2d at 929-30. "[T]he degree of difficulty and expense involved with segregating and ascertaining individual assets and liabilities of each of the entities is particularly relevant." *In re Castle Arch Real Estate Inv. Co., LLC*, 2013 Bankr. LEXIS 532 at *57.

B. Substantive Consolidation of the Debtors is Appropriate Under Applicable Law.

54. Based on the factors and considerations enumerated in *Fish*, *Gulfco*, *Horsley* and other cases within this Circuit and by this Court, substantive consolidation of the Debtors'

4864-3132-4759, v. 10

chapter 11 cases is appropriate.

55.      The Debtors operate as a single business enterprise on a consolidated basis, with the Debtors' assets and liabilities commingled and consolidated for accounting and reporting purposes. Ex. 1, *Meridian Declaration*, *passim*; Ex. 2, *Elliott Declaration*, ¶¶ 14, 15, 18. Additionally, the Debtors operate with a centralized management and ownership structure, with Loveloud and the Operating Debtors relying on management by Meridian to pay operating expenses, vendor invoices, debt obligations, and payroll. Ex. 1, *Meridian Declaration*, ¶¶ 18-106; Ex. 2, *Elliott Declaration*, ¶¶ 14, 15, 18, 20. The Debtors also share common creditors and debt obligations, with a significant magnitude of claims existing against all Debtors. Ex. 1, *Meridian Declaration*, ¶¶ 107-136; Ex. 2, *Elliott Declaration*, ¶ 14.

56.      The Debtors' business operations, assets, liabilities, and financial affairs are so completely commingled and consolidated that unscrambling the Debtors' affairs to operate the Debtors on an entity-by-entity basis is not feasible. Ex. 1, *Meridian Declaration*, ¶ 137. Not only would such an endeavor be prohibitively costly and detrimental to the chapter 11 cases, the estates, creditors, and parties in interest, but, like other franchise operations in the quick-serve restaurant industry, the Debtors would simply be unable to operate effectively. Ex. 1, *Meridian Declaration*, ¶ 138; Ex. 2, *Elliott Declaration*, ¶¶ 22, 31, 32.

   *(a) The Debtors' Common Ownership, Corporate Structure, and Shared Management Support Substantive Consolidation of the Debtors.*

57.      First, the Debtors operate as a single business enterprise with common ownership. Meridian is the sole owner of the membership interests in Loveloud; Loveloud is the sole owner of the membership interests in the Operating Debtors. Ex. 1, *Meridian Declaration*, ¶¶ 39, 41. *See Fish*, 114 F.2d at 191 (parent corporation owns all or majority of the stock of the subsidiary). Because the Debtors' consolidated operations are managed by Meridian, the Debtors are

4864-3132-4759, v. 10

effectively, and practically, managed by Meridian's owners and managers – PSCP Meridian LLC

is the managing member of Meridian; the managing member of PSCP Meridian, LLC is Polar

Star Capital Partners; James Winder is the manager of PSCP Meridian, LLC and the manager of

Polar Star Capital Partners. Ex. 1, *Meridian Declaration*, ¶¶ 33-36; Ex. 2, *Elliott Declaration*, ¶¶

21-28.   James Winder executed each of the Debtors' chapter 11 bankruptcy petitions. Ex. 1,

*Meridian Declaration*, ¶¶ 37, 38, 40.

58.     Consistent with industry practice by other quick-serve franchisees, despite their

regional differences and distinct legal statuses the Operating Debtors are not regarded as separate

operations. *Id*. at ¶ 42.   Instead, the operating entities are treated as geographic divisions of the

Debtors' operations, managed by Meridian from the Debtors' common corporate office in South

Ogden, Utah. *Id*. at ¶ 43.   *See Fish*, 114 F.2d at 191 (subsidiary is referred to as a department or

division).

59.     Loveloud and the Operating Debtors rely on Meridian for their corporate

management. Ex. 1, *Meridian Declaration*, ¶¶ 44-51; Ex. 2, *Elliott Declaration*, ¶¶ 26-32.

Meridian employs a corporate staff of management, financial, human resources, and other

personnel to manage the Debtors' operations on a system-wide basis. Ex. 1, *Meridian

Declaration*, ¶¶ 45, 47; Ex. 2, *Elliott Declaration*, ¶ 27.   These personnel make management

decisions for Meridian, Loveloud, and the Operating Debtors. Ex. 1, *Meridian Declaration*, ¶ 46;

Ex. 2, *Elliott Declaration*, ¶ 28.   Meridian personnel handle cash collection and management,

payroll, vendor contracting and payments, accounting, administrative services, and other matters

for all of the Debtors. Ex. 1, *Meridian Declaration*, ¶ 47; Ex. 2, *Elliott Declaration*, ¶ 29.

Loveloud and the Operating Debtors do not act independently or manage their own affairs but

take direction from Meridian and Meridian personnel. *See Fish*, 114 F.2d at 191 (parent and

subsidiary corporations have common directors or officers and directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation); *see also In re Thrive Nat'l Corp.*, 2018 Bankr. LEXIS 1501, at *14 (Bankr. D. Utah May 21, 2018) (citing shared common directors, officers and employees and sharing the same corporate headquarters as basis for substantive consolidation); *see also Horsley*, 2001 Bankr. LEXIS 1156 at *12 (extent to which the entity to be substantively consolidated was managed or controlled by the debtor). *see also In re Castle Arch Real Estate Inv. Co., LLC*, 2013 Bankr. LEXIS 532 at *11 (substantive consolidation appropriate where parent debtor provided administrative services to all debtors on a centralized basis). The individual Debtors do not act in their own interests; rather, the Debtors' common ownership and common management ensures that the entities are united and share the common goal of maximizing the value of the enterprise as a whole.

(b) *The Debtors Act as a Single Business Enterprise with Commingled Assets and Liabilities and Do Not Have a Separate Economic Existence Apart from Each Other.*

60.     The Restaurants operated by the Operating Debtors generate all of the revenue for the Debtors' business operations. Ex. 1, *Meridian Declaration*, ¶¶ 25, 60-73; Ex. 2, *Elliott Declaration*, ¶¶ 17, 21, 41, 52. While Meridian earns revenue or receives distributions from operations by non-debtor affiliates, that revenue is *de minimis* relative to the revenue generated by Restaurant operations. Ex. 1, *Meridian Declaration*, ¶¶ 26-28. The Debtors' situation is the flip side of the seventh consideration identified by the Tenth Circuit in *Fish* – in the Debtors' case, Meridian, the parent company, has substantially no business except with the Operating Debtors and virtually no assets except those conveyed to it by the Operating Debtors. The revenue generated at the Restaurants by the Operating Entities is transferred to and controlled by Meridian, and Meridian uses the revenue generated by the Restaurants to pay the operating

24

expenses, payroll, debt servicing, and other obligations of the Debtors' enterprise. Ex. 1, *Meridian Declaration*, ¶¶ 30, 60-73; Ex. 2, *Elliott Declaration*, ¶¶ 41-67.

61.     Likewise, the Operating Debtors do not have any business operations except generating revenue for the Debtors' enterprise. Ex. 1, *Meridian Declaration*, ¶ 29.   These Debtors do not have their own bank accounts for collection of cash or for payment of expenses, payroll, and debt obligations. Ex. 1, *Meridian Declaration*, ¶ 63; Ex. 2, *Elliott Declaration*, ¶¶ 44, 51.   All cash and non-cash revenue generated by the Restaurants is commingled into accounts held and controlled by Meridian at either Wells Fargo or Zions Bank; Meridian transfers funds from those accounts into other Meridian-held accounts at Zions Bank to make disbursements on behalf of Meridian, Loveloud, and the Operating Debtors. Ex. 1, *Meridian Declaration*, ¶¶ 60-73; Ex. 2, *Elliott Declaration*, ¶¶ 41-67.   Meridian controls the revenue generated by the Restaurants to fund payment of expenses, payroll, and debt obligations, including, but not limited to, general and administrative expenses, maintenance, purchases of food and beverage inventory, payment of utilities and other operating expenses, payment of wages and salaries for employees, and servicing of debt. Ex. 1, *Meridian Declaration*, ¶¶ 60-73; Ex. 2, *Elliott Declaration*, ¶¶ 41-67.   *See Fish*, 114 F.2d at 191 (parent corporation pays the salaries or expenses or losses of the subsidiary). While employees of the operating Debtors received checks payable from the Debtor, Meridian funds the Debtors' payroll from the commingled funds in the Zions Payroll Account held and managed by Meridian. Ex. 1, *Meridian Declaration*, ¶ 85; Ex. 2, *Elliott Declaration*, ¶ 66.

62.     The Debtors also report their financial and accounting statements to third parties and tax returns to taxing authorities on a consolidated basis. Ex. 1, *Meridian Declaration*, ¶¶ 72, 73, 101-106; Ex. 2, *Elliott Declaration*, ¶ 68-72.   *See In re Falls Event Ctr., LLC*, 600 B.R. at

869 (citing consolidated tax returns and consolidated financial records as favoring substantive consolidation) (citing *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 86 n. 7 (3d Cir. 2003); *In re Worldcom, Inc.*, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. 2003); *In re World access, Inc.*, 301 B.R. 217, 253-56 (Bankr. N.D. Ill. 2003)); *see also In re Thrive Nat'l Corp.*, 2018 Bankr. LEXIS 1501 at *7 ("Debtors regularly combined their collective assets and liabilities for accounting and reporting purposes, both internally and in representations to third parties."). The Debtors' balance sheets, income statements, and other financial statements are prepared on a consolidated basis. Ex. 1, *Meridian Declaration*, ¶¶ 101-106; Ex. 2, *Elliott Declaration*, ¶¶ 68-72. The Debtors' tax returns are filed as a consolidated tax return. Ex. 1, *Meridian Declaration*, ¶ 105; Ex. 2, *Elliott Declaration*, ¶ 71.

> (c) *The Debtors' Shared Debt Obligations and Common Creditors Favor Substantive Consolidation.*

63.     The Operating Debtors are primarily obligated on the unsecured debt owed to CNB, and Meridian and Loveloud are guarantors of that debt. Ex. 1, *Meridian Declaration*, ¶ 114; Ex. 2, *Elliott Declaration*, ¶ 114. In the past, Meridian has paid the debt obligations to CNB from commingled revenue earned from Restaurant operations. Ex. 1, *Meridian Declaration*, ¶ 115; Ex. 2. Additionally, Meridian and Loveloud are guarantors of the Franchise Agreements between BKC and the Operating Debtors; Meridian and Loveloud are also guarantors of the Lease Agreements between the Operating Debtors and the Restaurant property landlords, including, but not limited to, BKC. Ex. 1, *Meridian Declaration*, ¶ 124. Regardless of which operating Debtor is obligated on a real property lease, payment to the landlord is made by Meridian. Ex. 1, *Meridian Declaration*, ¶ 122. Prior to the Petition Date, the Debtors were sued by CNB and BKC in separate lawsuits to enforce the Debtors' respective obligations. Ex. 1, *Meridian Declaration*, ¶¶ 117, 127. *See In re Thrive Nat'l Corp.*, 2018 Bankr. LEXIS 1501 at

*9-10 (substantive consolidation appropriate where debtors shared common creditors, common creditors were paid from one debtor's operating account, and debtors were subject to lawsuits by shared creditors or claimants).  For these obligations, CNB and BKC can look to any Debtor for satisfaction of their debts.

64.     Outside of CNB and BKC, the Debtors also share a number of common creditors and debt obligations. Ex. 1, *Meridian Declaration*, ¶¶ 130-136.  Moreover, CNB and Burger King are not the only creditors who appear to consider the Debtors a common enterprise.   For example, on March 10, 2023, the Utah State Tax Commission filed Claim 3-1 against Meridian asserting a claim against Meridian in the amount of $1,594,672.62 for unpaid sales taxes, along with interest and penalties. Meridian has no sales and, therefore, would have no responsibility for these taxes if it were not part of the Debtors' consolidated business enterprise. The Utah Burger King Restaurants are operated by MR, not by Meridian..

65.     The United States Trustee acknowledges that the Debtors have many of the same creditors on their respective List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders. *See* Dkt. 93, Ex. B; *see also* Dkt. 95, Ex. B.

66.     The Debtors also share obligations for general and administrative expenses, various vendors for food and inventory, and utilities. Ex. 1, *Meridian Declaration*, ¶ 133; Ex. 2, *Elliott Declaration*, ¶ 133.  Prior to the Petition Date, the Operating Debtors did not pay vendor invoices for their Restaurants even if the vendor invoiced an item to a particular Restaurant or that vendor was specific to a Restaurant. Ex. 1, *Meridian Declaration*, ¶ 134; Ex. 2, *Elliott Declaration*, ¶ 67.  Rather, Meridian paid all vendor invoices. Ex. 1, *Meridian Declaration*, ¶ 134.  Meridian also pays all creditors owed for other operating expenses from commingled revenue earned by the operating subsidiaries. Ex. 1, *Meridian Declaration*, ¶ 135.  Thus, the

Debtors treated common creditors and vendors as dealing with a single entity, rather than separate debtors. Ex. 1, *Meridian Declaration*, ¶ 136. The same is true of other operating expenses, rental and lease payment, taxes, and utilities. Attempting to unscramble the Debtors' system of payments for vendors and other operating expenses would be prohibitively time consuming and expensive and would be detrimental to all creditors. Ex. 1, *Meridian Declaration*, ¶¶ 137-140.

> (d) *The Debtors' Business and Operations are Completely Commingled and Attempts to Unscramble the Debtors' Affairs Threatens the Debtors' Reorganization and Any Recovery by Creditors.*

67. Lastly, the financial affairs and business operations of the Debtors are so completely commingled that attempting to decentralize, or unconsolidated the Debtors' affairs would be commercially infeasible and detrimental to the Debtors' operations. Ex. 1, *Meridian Declaration*, ¶¶ 137-140; Ex. 2, *Elliott Declaration*, ¶¶ 14, 15. *In re Castle Arch Real Estate Inv. Co., LLC*, 2013 Bankr. LEXIS 532 at *57-58 ("substantive consolidation is proper where the assets of the entities in question are 'hopelessly commingled,' or where difficult accounting problems caused by the intercompany debt are 'so strong that the great expense (in order to bring about unscrambling) threaten[s] recovery.'") (quoting *Gulfco*, 593 F.2d at 928-30). The Debtors' management, vendor payment, cash management, and accounting systems are intertwined and entirely interdependent. Even if it were commercially feasible or practicable to do so, "unscrambling" the Debtors' business operations would be prohibitively time consuming, expensive, and very detrimental to the Debtors and creditors.

68. As discussed above, Loveloud and the Operating Debtors rely on management by Meridian and do not have their own separate management, financial, human resources, or other corporate personnel to act independently. The other Debtors rely on Meridian to manage their operations. All of the Debtors' combined affairs are managed on a consolidated basis as a single

enterprise by Meridian.

69.     Additionally, revenue earned from Restaurant operations is commingled into accounts held and managed by Meridian for payment of expenses, payroll, and debt obligations for all of the Debtors.  Moreover, even where expenses or debt obligations were unique to a Restaurant or Operating Debtor, Meridian paid the bills from commingled funds.  Further, even if the Debtors' consolidated accounting and financial systems could be unwound, it would not be beneficial to the estates to incur the expense of doing so.  A significant amount of accounting and expense would be required to "unscramble" the Debtors' interdependent business, financial, and accounting systems.

70.     Attempting to restructure the Debtors' corporate and management obligations – *i.e.*, installing separate management for each Debtor with the same effectiveness and efficiency as Meridian's management – would not be feasible, or, at a bare minimum, a herculean task. Accordingly, substantive consolidation of the Debtors is the most efficient and effective way to maximize distributions to creditors in these estates.

C.  Substantive Consolidation of the Debtors is in the Best Interests of Creditors.

71.     First, it is simply not commercially feasible to deconsolidate the Debtors' business operations from the status quo.  Deconstructing and reconstructing the Debtors' accounting and financial systems to be reported on an individual entity, nonconsolidated basis would be a painstaking task requiring a significant amount of time and expense by outside professionals.  Additionally, installing independent managers for every Debtor entity would reduce or eliminate the effectiveness and efficiency under which the Debtors currently operate. The significant administrative cost and burden of unscrambling the Debtors' centralized and consolidated business operations would not provide any benefit to creditors of the estates.

72.     Second, substantive consolidation will streamline the Debtors' chapter 11 cases and, among other things, reduce costs and delays associated with separate administration of the estates.  The Debtors may be required, under an interpretation of the law of this Circuit, to retain separate chapter 11 counsel.  The same interpretation may require the Debtors to separately retain other professionals, including, but not limited to, financial advisors and lease consultants. Multiple layers of professionals and advisors would greatly increase administrative costs to the detriment of all creditors.

73.     Lastly, a vast majority of the unsecured claims in the Debtors' chapter 11 cases are shared by all of the Debtors. Ex. 1, *Meridian Declaration*, ¶ 110. The Debtors are jointly and severally liable on the unsecured obligation to CNB, and Meridian and Loveloud are guarantors of that obligation. Ex. 1, *Meridian Declaration*, ¶ 114.  Meridian and Loveloud are also guarantors of the Operating Debtors' obligations under the Franchise Agreements and Lease Agreements to BKC. Ex. 1, *Meridian Declaration*, ¶ 124.  The approximately $52,495,130 in combined unsecured obligations to CNB and BKC represent roughly 81% of the estimated $64,733,225 in unsecured liabilities of the Debtors' chapter 11 estates. Ex. 1, *Meridian Declaration*, ¶ 110.  Substantive consolidation would not change CNB's and BKC's ability to look to the Debtors as a single source for satisfaction of their debts.

74.     As of March 28, 2023, the claims registers in each of the Debtors' chapter 11 cases reflects that:

- seventeen (17) claims have been filed in In re Meridian Restaurants Unlimited, LC, Case No. 23-20731-KRA;

- zero (0) claims have been filed in In re Loveloud Restaurants, LC, Case No. 23-20732-KRA;

- four (4) claims have been filed in In re AZM Restaurants, LC, Case No. 23-20733-KRA;

- seven (7) claims have been filed in <u>In re HR Restaurants, LC</u>, Case No. 23-20736-KRA;

- two (2) claims have been filed in <u>In re MR Restaurants, LC</u>, Case No. 23-20737-KRA;

- four (4) claims have been filed in <u>In re NDM Restaurants, LC</u>, Case No. 23-20738-KRA; and

- three (3) claims have been filed in <u>In re NKS Restaurants, LC</u>, Case No. 23-20739-KRA.

Of those thirty-seven (37) claims filed as of March 28, 2023, totaling $5,078,956.78, at least $3,189,249.22 (63%) is claimed as owed by more than one Debtor.[11]  For creditors asserting claims owed by single Debtor only, substantive consolidation will give those creditors recourse against all of the Debtors, rather than simply the individual Debtor against whom they currently hold a claim.

75.    Accordingly, the Debtors submit that substantive consolidation of the Debtors' chapter 11 cases is in the best interests of creditors, parties in interest, and the Debtors' respective bankruptcy estates. <u>Ex. 2</u>, *Elliott Declaration*, ¶¶ 14, 15.

**II.    Consolidation Should be Ordered *Nunc Pro Tunc* to the Petition Date.**

76.    "The analysis of whether to order substantive consolidation *nunc pro tunc* 'closely parallel[s]' the analysis of whether to substantively consolidate entities in the first place." *In re The Falls Event Center LLC,* 600 B.R. at 869 (quoting *In re Bonham*, 226 B.R. 56, 99 (Bankr. D. Ala. 1998)).

---

[11] The $5,078,956.78 reflects the total amount of all claims filed in the Debtors' cases, including a claim in the amount of $1,594,672.62 filed by the Utah State Tax Commission in both <u>In re Meridian Restaurants Unlimited, LC</u>, Case No. 23-20731-KRA, and <u>In re MR Restaurants, LC</u>, Case No. 23-20737-KRA.  After removing the duplicate claim, the Utah State Tax Commission's filed claim of $1,594,672.62 is forty-six percent (46%) of the $3,484,284.16 in total filed claims.

4864-3132-4759, v. 10

77.     "Courts have developed two tests for *nunc pro tunc* consolidation, with the key factor under both tests being whether there was 'reliance on an entity's apparent separateness.'" *Id.* (quoting *In re Bonham*, 226 B.R. at 99).

78.     The first test "requires the movant to show that such consolidation is necessary to achieve some benefit or avoid some harm.  If this showing is made, *nunc pro tunc* consolidation will be allowed unless any opposing party proves that it relied on the separate credit of one of the entities to be consolidated *and* that the harm to it in shifting a filing date will outweigh the benefits of *nunc pro tunc* consolidation." *Id.* at 869-70 (citations omitted).

79.     The second test considers the following two facts in determining whether substantive consolidation should occur as of the petition date:  "(1) whether the creditors dealt with the consolidated entities as if they were the same, *or* (2) the affairs of the consolidated entities are so entangled that it would not be feasible to identify and allocate all of their assets and liabilities." *Id.* at 870 (citations omitted).

80.     In *The Falls Event Center* case, Judge Mosier ordered substantive consolidation of the parent and its various subsidiaries *nunc pro tunc* to the date of filing of the parent's petition date.  In so doing, Judge Mosier noted substantive consolidation "as of the TFEC Petition Date is appropriate" under either of the foregoing tests because "[t]he Falls Parties had no corporate existence outside of the TFEC corporate group" and also because "[t]he Falls Parties' affairs are so entangled with those of TFEC that it would be most efficient to consolidate them as of the TFEC Petition Date, which allows the Trustee to capture the Falls Parties' assets on the consolidated estate." *Id.*

81.     The same is true here.  The Debtors have no corporate existence outside of the Meridian corporate group. Meridian collects all revenues and paid all expenses for all of the

Debtors, and all of the managerial employees worked for Meridian but provided services to all of the Debtors.

82.    Further, the business and financial affairs of the Debtors are so entangled and intertwined that it would be most efficient to consolidate all of their assets and liabilities as of the Petition Date. Indeed, the Debtors believe it would be virtually impossible to untangle and separate the assets and liabilities of the Debtors.

83.    Accordingly, for the foregoing reasons, not only should the Court order that the Debtors and their estates are substantively consolidated, but the Court should further order that substantive consolidation of the Debtors and their estates will be effective *nunc pro tunc* to the Petition Date.

## **CONCLUSION**

84.    Based on the facts and circumstances set forth above, as well as the law of the Tenth Circuit and standards for substantive consolidation of bankrupt estates, substantive consolidation of the Debtors is appropriate and in the best interests of the Debtors, the estates, creditors and parties in interest, and the most efficient and effective way to maximize the value of the assets of the Debtors' estates and potential distributions to creditors.  Further, substantive consolidation of the Debtors *nunc pro tunc* to the Petition Date is appropriate.

WHEREFORE, the Debtors respectfully request the Court enter an order granting the Motion substantively consolidating the Debtors, their estates, assets, and liabilities such that there is a single consolidated estate in the chapter 11 case, *nunc pro tunc* to the Petition Date, and granting the Debtors such other and further relief as the Court deems just and proper under the circumstances.

33

DATED: March 31, 2023

Respectfully submitted,

RAY QUINNEY & NEBEKER P.C.

By: */s/ Michael R. Johnson*
Michael R. Johnson (7070)
David H. Leigh (9433)
Elaine A. Monson (5523)
36 South State Street, 14th Floor
Salt Lake City, Utah 84111
Tel: (801) 532-1500
Email: mjohnson@rqn.com
Email: dleigh@rqn.com
Email: emonson@rqn.com

*Proposed Counsel for the Debtor-In-Possession*

-- and --

MARKUS WILLIAMS YOUNG &
HUNSICKER LLC

By: */s/ William G. Cross*
James T. Markus *(pro hac vice)*
William G. Cross *(pro hac vice)*
Lacey S. Bryan *(pro hac vice)*
1775 Sherman Street, Suite 1950
Denver, Colorado 80203-4505
Telephone (303) 830-0800
Facsimile (303) 830-0809
Email: jmarkus@markuswilliams.com
Email: wcross@markuswilliams.com
Email: lbryan@markuswilliams.com

*Proposed Counsel for the Debtor-In-Possession*

4864-3132-4759, v. 10