J. Thomas Beckett (UT Bar No. 5587)
**PARSONS BEHLE & LATIMER**
201 S. Main Street, Suite 1800
Salt Lake City, UT 84111
Tel: 801-532.1234
Fax: 801-536.6111
TBeckett@parsonsbehle.com
ECF@parsonsbehle.com

Paul J. Battista (FL Bar No. 884162)
(Admitted Pro Hac Vice)
Glenn D. Moses (FL Bar No. 174556)
(Admitted Pro Hac Vice)
**VENABLE, LLP**
100 SE 2nd Street, Suite 4400
Miami, FL 33131
Tel: 305-372-2522
PJBattista@Venable.com
GDMoses@Venable.com

*Counsel for Burger King Company, LLC*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>MERIDIAN RESTAURANTS UNLIMITED, LC; LOVELOUD RESTAURANTS, LC; AZM RESTAURANTS, LC; HR RESTAURANTS, LC, MR RESTAURANTS, LC, NDM RESTAURANTS, LC, and NKS RESTAURANTS, LC,<br><br>Debtors-in-Possession. | Bankruptcy Case No. 23-20731-KRA<br>Bankruptcy Case No. 23-20732-KRA<br>Bankruptcy Case No. 23-20733-KRA<br>Bankruptcy Case No. 23-20736-KRA<br>Bankruptcy Case No. 23-20737-KRA<br>Bankruptcy Case No. 23-20738-KRA<br>Bankruptcy Case No. 23-20739-KRA<br><br>Chapter 11<br><br>Honorable Kevin R. Anderson<br><br>**Jointly Administered Under Bankruptcy Case No. 23-20731-KRA** |

**JOINDER OF BURGER KING COMPANY LLC**
**IN THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**FOR ENTRY OF AN ORDER TERMINATING THE DEBTORS' EXCLUSIVE**
**PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES**
**AND**
**GENERAL RESERVATION OF RIGHTS**

Burger King Company LLC ("BKC"), by and through its undersigned counsel, files its Joinder (the "Joinder") in the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Terminating the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances [ECF No. 274] (the "Motion to Terminate")[1] and General Reservation of Rights, and in support thereof respectfully states as follows:

### PRELIMINARY STATEMENT

1.    From the outset of these Chapter 11 cases, BKC has consistently expressed its views to the Debtors that the Debtors' Restaurants need to be marketed and sold through an orderly sale process and in a manner that respects BKC's approval rights in connection therewith, all as more fully discussed herein.  As set forth in the Motion to Terminate, the Committee has come to the same or substantially similar views, and has also expressed those views to the Debtors on more than one occasion.  Notwithstanding the strong views advanced by the major constituents in these Chapter 11 cases, the Debtors have ignored those views and appear bent on pursuing a path that is doomed to fail.

2.    BKC believes that the marketing and sale of the Restaurants is the only viable option available to the Debtors, which option is consistent with their fiduciary duties to the stakeholders in these cases as explained by the Committee in the Motion to Terminate.  As set forth below and in addition to the reasons outlined by the Committee, BKC does not believe the Debtors can achieve an internal reorganization or "new value" plan over BKC's objection to any proposed assumption by the Debtors of the BKC Franchise Agreements (as defined below).  If the Debtors insist on continuing down an ill-fated "reorganization" path that does not have the

---

[1] All capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Motion to Terminate.

support of its major creditor constituencies, then they are free to do so at their own peril. However, such path should not be at the expense and exclusion of the major creditors in these cases. Rather, for the reasons set forth in the Motion to Terminate and as outlined below, the process needs to be opened up for a marketing and sale of the Debtors' Restaurants in order to provide a feasible path for these Chapter 11 cases and to maximize value to the stakeholders herein.

3.      To that end, BKC joins in and requests that the Court grant the Motion to Terminate, subject to the reservation of BKC's rights with respect to any sale and assignment of its Franchise Agreements as outlined below.

## BACKGROUND

### A.      The BURGER KING® System and the Franchisee Relationship

4.      As the Court knows, BKC is the Debtors' franchisor.[2]  Founded in 1954, the BURGER KING® brand is the second largest fast food hamburger chain in the world measured by number of restaurants. The original HOME OF THE WHOPPER®, the BURGER KING® system operates more than 19,000 locations in more than 100 countries. Almost 100 percent of BURGER KING® restaurants are owned and operated by independent franchisees.

5.      The relationship between BKC and its franchisees is one of a shared, long-term interest.  Unlike many contracts or vendor arrangements, BKC's franchise agreements are typically for a term of 20 years. To that end and in order to enable and sustain long-term results, BKC and its franchisees work together on a daily basis and have ongoing responsibilities to one another.  For example, BKC provides support to its franchisees by investing in and providing operational training for each franchisee's key staff members, setting health and safety standards,

---

[2] As set forth therein, BKC is also a landlord for seven (7) of the Debtors' restaurants.

developing marketing strategies, and developing new menu items designed to improve restaurant sales, traffic and profitability. For their part, franchisees are in turn obligated not only to make royalty and advertising payments, but to properly represent the brand every day with every customer, including adherence to health, safety, operations and brand standards.

6.      The many benefits to franchisees of being in the BURGER KING® system also include access to certain BKC intellectual property and proprietary information, including, without limitation, trademarks, signs, logos, recipes, designs, training manuals, advertising materials, access to BK.com, mobile apps, loyalty programs, and other trade secrets and confidential information.

7.      Importantly, any failure or operational shortcoming by a franchisee is likely to be attributed by restaurant guests to the entire BURGER KING® brand, damaging the brand's reputation and in turn the prospects of neighboring franchisees, and potentially a significant portion of the entire system itself. Moreover, each franchisee's actions directly impact the BURGER KING® brand. For example, a franchisee's failure to meet operational expectations and provide a guest with a positive experience is likely to result in that guest's view of the brand being diminished.[3] It is also the case that the failure of a franchisee to pay its contractually obligated payments to BKC can damage the system. For example, if a franchisee fails to make its advertising fund payments as called for in each franchise agreement, then the annual advertising budget for the brand will be reduced. A reduced budget, in turn, puts BKC and the

---

[3] In order to safeguard and consistently improve the guest experience, BKC utilizes a set of tools to evaluate its franchisees' operational quality, gauging metrics that assess key areas such as health and safety, product quality and consistency, speed of service, and overall guest satisfaction (collectively, the "Ops Scores"). BKC calculates and tracks the Ops Scores for each franchisee over certain rolling time periods, and then compares them to other franchisees in order to provide an assessment of each franchisee's performance.

entire franchise system at a competitive disadvantage, damaging prospects for all franchisees by weakening critical national advertising campaigns.

8. Whether it is in the form of substandard operational performance or a failure to meet contractual payment obligations, the larger the franchisee, the greater the impact to the brand and the BURGER KING® system as a whole. To that end, in the Motion to Terminate, the Committee makes reference to a BKC policy that a "single management group operate no more than fifty franchise locations." Motion to Terminate at ¶24. The Committee is partly correct in that BKC has recently adopted a policy designed to limit, where appropriate, the number of restaurants that can be operated by a franchisee to no more than fifty (50) restaurants. However, BKC's policy also requires that the restaurants be contained within the franchisee's particular geographic location. To that end and as discussed below, BKC has proposed that the Debtors' Restaurants be packaged and sold by geographic region.

9. As a result of the above and for other important reasons, BKC makes great efforts to ensure that the BURGER KING® brand name is closely protected. BKC takes this process very seriously by, among other things, creating and enforcing brand standards, marketing BURGER KING® products nationwide, and working with existing franchisees (and approving new franchisees who are aligned with BKC) in order to represent BKC's iconic trademarks with pride to the betterment of the entire system.

10. With respect to existing franchisees like the Debtors herein, BKC works closely with them on almost a daily basis to ensure compliance with the BKC Franchise Agreements and the protection and advancement of the BURGER KING® brand. Among other things, BKC performs periodic inspections of the franchisee's restaurants, including in respect of public health and safety standards. In the event of a violation by a franchisee of any of the requirements

under the franchise agreements, especially public health and safety violations, BKC acts immediately, advises the franchisee and often times issues a default letter insisting on prompt action to remedy the violation.

11.     BKC works with its existing franchisees through a "Managing Owner" designated under the franchise agreement.  The "Managing Owner" is the person who is granted the authority by the franchisee to bind the franchisee in any dealings with BKC.  In addition and importantly, the "Managing Owner" is the person at the franchisee who is responsible for directing any action necessary to ensure compliance with the franchise agreement and other agreements related to the restaurants.  The designated "Managing Owner" of the franchisee is required to have a certain minimal ownership interest in the franchisee and, importantly, is the person required to personally guarantee the franchisee's obligations to BKC under the franchise agreements.  The "Managing Owner" is a critical component of the franchise relationship with BKC, an issue that is discussed in more detail below as it relates to the Debtors herein.

12.     In addition to BKC's interactions with and requirements imposed on its existing franchisees, BKC employs a rigorous screening and approval process for any new franchisee who wants to enter the BURGER KING® system, as well as any existing franchisee who wants to expand its footprint within the BURGER KING® system.  Over decades of experience, BKC has continually worked to improve and strengthen its screening processes, as well as the training provided to admitted candidates.  As such, BKC's practices are time-tested and are a critical tool for safeguarding the entire system.

13.     Upon receipt of an inquiry from a prospective franchisee, BKC evaluates the franchisee candidate using a multi-step vetting process (the "Franchisee Approval Process"). When evaluating a candidate (and where appropriate the candidate's owners, partners,

management members and team), BKC typically first performs a candidate assessment. This assessment process includes, among other things: (a) reviewing the candidate's experience and operational qualifications, financial strength and business plan; (b) performing background and credit checks, as well as verifying net worth; and (c) confirming alignment with BKC requirements on matters such as minimum ownership percentages for key personnel, maximum leverage criteria, contiguous operations and personal guarantees. If the candidate has entered this phase of the process with a specific acquisition in mind, then the evaluation will also take into account the specific terms of the acquisition transaction proposed by the candidate, because the requirements for someone seeking to acquire 5 restaurants versus 25 restaurants will necessarily differ in a material way. Similarly, BKC's approval process takes into consideration whether the proposed acquisition will significantly increase (ie. double) the size of the proposed purchaser's restaurant portfolio.

14.     If the candidate meets BKC's initial screening criteria, then they will be invited to meet with members of the BKC leadership team for an in-depth review of their business plan as well as more general discussions about their business philosophy and history. Once BKC provides preliminary approval of the candidate to become a franchisee, and if an asset purchase agreement has been submitted, then the process moves to a more detailed review of the submitted transaction. From this point, the process conducted by BKC is similar for both new candidates and existing franchisees seeking to expand and acquire additional restaurants.

15.     At this phase, the formal approval process involves four (4) core areas: Operational, Legal, Credit and Financial. During this process, BKC leadership will again assess the proposed franchisee's operational capabilities and financial plan relative to the size of the acquisition and the geographic spread of the restaurants. Among the key financial considerations

is the candidate's "capitalization" plan, and specifically the amount of expected debt relative to the EBITDA of the post-acquisition franchisee.  As with other components of the approval process, BKC weighs the size of the post-acquisition franchisee very carefully when considering the "Financial" approval, with an important perspective being the larger the franchisee, the greater the need to protect the franchise system.

16.    Another critical component of the process is the inspection by BKC of the target restaurants.  This process in intended to ensure that the buying franchisee is fully aware of any equipment or repair and maintenance issues that will need to be addressed immediately after the consummation of the acquisition.  In addition, to the extent that any of the target restaurants are nearing the expiration of the term of their franchise agreements, then BKC will work with the prospective franchisee to ensure a clear understanding of what capital improvements, ie. remodels, will be required in order to receive a new franchise agreement upon the expiration of the existing one.  The financial implications of both the inspections and those restaurants with a limited term left on their franchise agreements are factored into BKC's "Financial" approval decision.

17.    The Franchisee Approval Process has been developed over many years, and given the length of BKC's standard franchise agreement (20 years), is clearly critical to both protecting the BURGER KING® brand and helping to place franchisees in a position to succeed. Importantly, because of the length of the franchise relationship and the need to protect the BURGER KING® brand, a significant part of the approval process for BKC in addition to the above four core areas is to ensure that a prospective franchisee's business philosophy and approach to the franchise relationship is fully aligned with BKC's philosophy and approach.

18.     The processes and procedures discussed above and imposed by BKC on both existing franchisees and prospective new franchises are critical to BKC because without them in place and enforced, BKC cannot be confident that any franchisee will be successful or that the BURGER KING® brand will be protected.  And without that confidence, it is simply untenable for BKC to continue with a 20-year franchise agreement for existing franchisees or enter into a new 20-year franchise agreement for new franchises.

19.     Lastly, because the actions or omissions of a franchisee can have a significant impact on the entire system, in addition to the above-described processes, BKC maintains a set of rights, certain of which are outlined below, under the operative relationship documents (ie. franchise agreements) to help protect the BURGER KING® brand, and in turn, its community of franchisees.

**B.     The Bankruptcy Cases**

      **a.  Introduction and BKC Claims**

20.     On March 2, 2023 (the "Petition Date"), each of Meridian Restaurants Unlimited, LC, Loveloud Restaurants, LC, AZM Restaurants, LC, HR Restaurants, LC, MR Restaurants, LC, NDM Restaurants, LC, and NKS Restaurants, LC (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On March 28, 2023, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") for the Debtors' cases.

21.     As of the Petition Date, the Debtors operated one-hundred sixteen (116) BURGER KING® restaurants (the "Restaurants") in the states of Utah, Montana, Wyoming, North Dakota, South Dakota, Minnesota, Nebraska, Kansas and Arizona under separate franchise

agreements (the "Franchise Agreements") with BKC.[4]  Each of the Restaurants is also subject to its own lease agreement (the "Leases").  BKC is the landlord for seven (7) of the Debtors' Restaurants.

22.  Pursuant to this Court's *Order Authorizing Immediate Store Closings at Certain Restaurant Locations* [ECF No. 155], the Debtors were authorized to cease operations at twenty-three (23) Restaurants.  Thereafter and pursuant to this Court's *Order Authorizing the Rejection of Certain Unexpired Lease of Nonresidential Real Property and Executory Contracts* [ECF No. 268] (the "Rejection Order"), the Debtors were authorized to reject the Franchise Agreements relating to those Restaurants as well as the Lease with BKC relating to one (1) of those Restaurants (Store No. 13029).

23.  As of the Petition Date, BKC is due the sum of approximately $4.6 million from the Debtors on account of obligations accrued under the Franchise Agreements, including unpaid royalty and advertising fees.[5]  Of this amount, a total of approximately $3.95 million is due as of the Petition Date for amounts owed (including unpaid royalty and advertising fees) relating to the 93 Restaurants that remain open.[6]  As the Court is aware, all monetary defaults existing under the Franchise Agreements being assumed need to be cured in connection with and as a condition to the Debtors' assumption of such Franchise Agreements. [7]

### b.  BKC's Position Regarding the Direction of the Chapter 11 Cases

---

[4] For reference purposes, a copy of the Franchise Agreement for Restaurant Number 14184, located at 99 East 5th Avenue, Douglas, Arizona, is attached as **Exhibit "A".**

[5] This sum is exclusive of any rejection damage claims that BKC will file pursuant to the Rejection Order or otherwise.

[6] BKC reserves the right to finalize such cure amounts at the appropriate time.

[7] As set forth below, BKC also asserts that there are several non-monetary defaults existing under the Franchise Agreements, certain of which are incurable without the consent of BKC.

24.     Since the outset of these cases, BKC has advised the Debtors on several occasions that BKC would not support a scenario where the Debtors retain ownership of the Restaurants pursuant to an internal restructuring and "new value" plan of reorganization under the control of their Managing Member and self-appointed Chief Restructuring Officer James Winder ("Winder").[8]

25.     Instead, BKC believes that the best outcome for all stakeholders in these bankruptcy cases is for the Restaurants to be marketed and sold in an orderly sale process by geographic region[9] to potential BKC-qualified purchasers.[10]  To that end, BKC has advised the Debtors that a marketing and sale process is the only viable path that BKC would support.

26.     As set forth below, BKC does not believe the Debtors can confirm a plan of reorganization, based on "new value" or otherwise, over BKC's objection in respect of any proposed assumption by the Debtors of the Franchise Agreements.

27.     Notwithstanding the fact that BKC has repeatedly advised the Debtors as to such views and position, on Friday June 2, 2023, BKC met with the Debtors via video conference to listen to Mr. Winder's presentation of an outline of a proposed plan of reorganization which included various scenarios under which Mr. Winder and the Debtors proposed to retain ownership and control over a substantial number of the Restaurants.

---

[8] As discussed in more detail below, Mr. Winder is not the designated Managing Owner of the Debtors under the Franchise Agreements, and an incurable default exists under the Franchise Agreements in connection therewith.

[9] Of the Restaurants that remain open, BKC believes they should be marketed and sold based on their relative geographic location: Utah/Wyoming (27 Restaurants), Arizona (7 Restaurants), Montana (16 Restaurants), the Midwest (North Dakota, South Dakota and Minnesota - 25 Restaurants), Kansas (12 Restaurants), and Nebraska (9 Restaurants).

[10] BKC has been approached by a number of prospective purchasers for certain groupings of the Restaurants and has passed along such interest to the Debtors.  BKC does not believe the Debtors have engaged in any marketing effort to date for a proposed sale of the Restaurants.

28.     Following the meeting, BKC advised the Debtors once again that BKC was steadfast in its position concerning the need for an immediate marketing and sale of the Restaurants, and urged the Debtors not to pursue a path that would be fraught with objections and unnecessary cost and delay, all to the detriment of creditors and stakeholders in these bankruptcy cases.

29.     Shortly after those discussions between BKC and the Debtors, the Committee filed the Motion to Terminate, which BKC supports.

## JOINDER IN MOTION TO TERMINATE AND GENERAL RESERVATION OF RIGHTS

30.     In the Motion to Terminate, the Committee seeks the entry of an order terminating the Debtors' exclusive right to file a plan of reorganization (solely as to the Committee), and certain related relief, including to (a) allow the Committee to propose a competing plan, (b) order the Debtors to provide all necessary information to conduct a marketing and sale process, (c) require the Debtors to cooperate in the sale process, (d) set a scheduling order with respect to the proposal and solicitation of competing plans.

31.     For the reasons set forth herein, BKC joins in and supports the Committee's Motion to Terminate.  BKC believes that the best outcome for creditors and the bankruptcy estates is for the Restaurants to be marketed and sold in an orderly sale process, by geographic region, as opposed to the Debtors' retention of the Restaurants under a "new value" plan, which for the reasons outlined by the Committee and by BKC below, is destined for failure, including because the Debtors do not have the ability to assume the Franchise Agreements over BKC's objection.

32.    To be clear, BKC supports the sale of the Debtors' Restaurants provided that BKC's rights under its Franchise Agreements, the Bankruptcy Code and well-established non-bankruptcy federal law (ie. the Lanham Trademark Act, codified in Chapter 22 of Title 15 of the United States Code (the "<u>Lanham Act</u>")) are acknowledged, respected and protected in connection therewith, including, without limitation, its cure rights, approval rights and consent rights.[11]  Assuming the Court terminates exclusivity and authorizes the Committee to conduct a sale process (whether under section 363 or through a plan), BKC intends to work closely and cooperatively with the Committee (and ideally, the Debtors as well) in connection therewith, including to assist in identifying and approving prospective purchasers.

33.    In addition to the confirmation issues raised by the Committee in the Motion to Terminate, BKC's consent is required with respect to any assumption, or assumption and assignment, of its Franchise Agreements.

**A.    The Debtors Cannot Assume the Franchise Agreements Without BKC's Consent Under Section 365(c)(1) of the Bankruptcy Code.**

34.    BKC objects to any attempt by the Debtors (or their ownership) to assume and retain an interest in the Franchise Agreements or the Restaurants under a plan of reorganization or otherwise, unless such assumption is in connection with a proposed sale of the Restaurants in a manner acceptable to BKC as discussed herein.

35.    Pursuant to section 365(c)(1) of the Bankruptcy Code, the Debtors may neither assume nor assign the Franchise Agreements if (1) applicable law excuses BKC from accepting

---

[11] For example, paragraph 55 of the Motion to Terminate provides: "To the extent that old equity wishes to participate as a bidder in a competitive process, it may do so."  BKC reserves the right to exercise its consent and approval rights with respect to all bidders, including as to the Debtors, their management and/or ownership, and Mr. Winder.

performance from a party other than the Debtors, and (2) BKC does not consent to such
assumption or assignment.

36.     Specifically, Section 365(c)(1) of the Bankruptcy Code provides:

> (c) The trustee **may not assume or assign any executory contract**
> or unexpired lease of the debtor, whether or not such contract or
> lease prohibits or restricts assignment of rights or delegation of
> duties, if—
>
> (1) (A) applicable law excuses a party, other than the
> debtor, to such contract or lease from accepting performance from
> or rendering performance to an entity other than the debtor or the
> debtor in possession, whether or not such contract or lease
> prohibits or restricts assignment of rights or delegation of duties;
> and
>
> (B) such party does not consent to such assumption or
> assignment; ….

(emphasis added). *See* 11 U.S.C. § 365(c)(1); *In re Taylor Inv. Partners II, LLC*, 533 B.R. 837,

843 (Bankr. N.D. Ga. 2015); *In re James Cable Partners, L.P.*, 27 F.3d 534, 537 (11th Cir.

1994); *In re O'Connor*, 258 F.3d 392, 402 (5th Cir. 2001) (holding that the focus for determining

whether an agreement may not be assumed under section 365(c) is whether other applicable law

restricts assumption); *In re Trump Entm't Resorts, Inc.*, 526 B.R. 116, 122 (Bankr. D. Del.

2015). Thus, the limitation on the assumption or assignment of executory contracts set forth in

section 365(c) "applies whenever the contract is 'subject to a legal prohibition against

assignment' to a third party and the non-debtor party to the contract does not consent to

assignment." *Trump Entm't Resorts*, 526 B.R. at 122.

37.     Specifically, the plain meaning of Section 365(c)(1) of the Bankruptcy Code

provides that a debtor may not "*assume or assign*" any executory contract if applicable law

prohibits the *assignment* of that agreement without consent. Therefore, because applicable

federal trademark law, the Lanham Act, excuses BKC from accepting performance under the

Franchise Agreements from anyone other than the Debtors (i.e., a non-consensual assignment), then the Debtors are specifically barred from *assuming* the Franchise Agreements, even if the Debtors do not propose to *assign* the Franchise Agreements.

38.    This is commonly known as the "hypothetical test," because if a debtor would be precluded from hypothetically assigning an agreement under applicable law, then it is also precluded from assuming it in its bankruptcy case.   The principal support for the hypothetical test is based on a plain reading of the literal language of Section 365(c)(1) of the Bankruptcy Code[12] and has been adopted by a majority of courts around the country, including at the Circuit Court level.   *In re Sunterra Corporation*, 361 F. 3d 257 (4th Cir. 2004) (Debtor was precluded from assuming a computer software licensing agreement, even though there was no intention to assign the agreement, on the basis that applicable copyright law excused the other party to the contract from accepting performance from any hypothetical third party); *In re Catapult Entertainment, Inc.*, 165 F. 3d 747 (9th Cir. 1998) (under the plain reading of Section 365(c)(1) of the Bankruptcy Code, the debtor was barred from assuming patent licenses without the licensor's consent; federal patent law constituted "applicable law" and that nonexclusive patent licenses were assignable only with the patent licensor's consent); *In re James Cable Partners, L.P.*, 27 F.3d. 534, 537 (11th Cir. 1994) (Section 365(c)(1) creates a hypothetical test, namely that a debtor cannot assume an executory contract if applicable law prevents the involuntary assignment of that contract); *In re West Electronics, Inc.*, 852 F 2d 79 (3rd Cir. 1988) (Stay relief was appropriate to terminate government contract, holding that pursuant to Section 365(c)(1),

---

[12] Section 365(c)(1) is written in the disjunctive:  a debtor "may not assume <u>or</u> assign" a contract if non-bankruptcy law precludes its assignment without consent of the other party.

since under non-bankruptcy law the debtor could not *assign* the contract without the government's consent, it therefore could not *assume* the contract without the government's consent); *In re Wellington Vision, Inc.*, 364 B.R. 129, 134-37 (S.D. Fla. 2007) (Pearle Vision franchisee could not assume franchise agreement where applicable federal trademark law precluded the non-consensual assignment of the agreement); *In re N.C.P. Mktg. Group, Inc.*, 337 B.R. 230, 235–37 (D. Nev. 2005), *aff'd,* 279 Fed.Appx. 561 (9th Cir.2008), *cert. denied,* 556 U.S. 1145 (2009) (Trademark licensing agreement was not assumable, because under Section 365(c)(1) and applicable federal trademark law, the license could not be assigned without the licensor's consent); *In re Ajranc Insurance Agency, Inc.*, 2021 WL 274937 (Bankr. M.D. Fla. 2021) (Section 365(c)(1) prohibited debtor from assuming franchise agreement where applicable federal trademark law excused the franchisor from accepting performance from a third party); *In re Trump Entertainment Resorts, Inc.*, 526 B.R. 116, 122 (Bankr. D. Del. 2015) (Relief from the automatic stay granted to terminate trademark license, where under Section 365(c)(1) and applicable federal trademark law, the licensee could not assume the trademark license because it could not be assigned without the licensor's consent); *In re Taylor Investment Partners II, LLC*, 533 B.R. 837 (Bankr. N.D. Ga. 2015) (Franchisor entitled to stay relief to terminate franchise agreements, where debtor franchisee could not assume agreements due to the inability to assign franchise agreements under applicable federal trademark law); *In re Kazi Foods of Michigan, Inc.*, 473 B.R. 887, 890 (Bankr. E.D. Mich. 2011)(Franchisee of KFC restaurants could not assume franchise agreements, based on Section 365(c)(1) and applicable federal trademark law precluding assignment without the franchisor's consent").[13]

---

[13] BKC notes that there is a contrary line of cases adopted by a minority of circuits and lower courts, applying what is called the "actual test," disallowing assumption of an executory contract under Section 365(c)(1) and applicable law only where there is an actual proposed assignment of such agreement. *Institut Pasteur v. Cambridge Biotech*

39.     Accordingly, the Debtors are not able to assume the Franchise Agreements without BKC's consent, regardless of any proposed assignment,

**B.     The Debtors Cannot Assume the Franchise Agreements Without BKC's Consent Due to Incurable Non-Monetary Defaults Thereunder.**

### a.  Generally

40.     Assuming arguendo that the Debtors could overcome the restrictions on assumption of the Franchise Agreements pursuant to Section 365(c)(1) of the Bankruptcy Code discussed above (which BKC asserts they cannot do), then pursuant to Section 365(b)(1)(A) of the Bankruptcy Code, the Debtors are required to cure all defaults, including non-monetary defaults, under the Franchise Agreements as a condition to the assumption thereof.

41.     As set forth above, the Debtors owed BKC an amount equal to approximately $3.95 million for unpaid amounts under the Franchise Agreements prior to the Petition Date. Such amounts would need to be paid in connection with any attempted assumption of the Franchise Agreements. As noted by the Committee in the Motion to Terminate, the Debtors are depleting their cash and do not have any equity infusions or debt financing currently available in connection with any proposed "new value" plan. As a result, it is highly unlikely that the Debtors will have the financial resources necessary to cure such monetary defaults.

42.     Moreover, certain non-monetary defaults exist under the Franchise Agreements, including (as described below) with respect to (a) the Managing Owner default, (b) the remodel defaults, (c) the equipment defaults, and (d) the Restaurants that are operating without Franchise

---

*Corp.*, 104 F.3d 489 (1st Cir. 1997); *In re Mirant Corp.*, 440 F.3d 238 (5th Cir. 2006); *In re Ohio Skill Games,* 2010 WL 2710522 (Bankr. N.D. Ohio 2010); *In re Cajun Elec. Power Co-op, Inc.*, 230 B.R. 693 (Bankr. M.D. La. 1999); *In re Ontario Locomotive & Indus. Ry. Supplies (U.S.), Inc.*, 126 B.R. 146 (Bankr. W.D.N.Y. 1991). There is no binding authority in the Tenth Circuit, with BKC being aware of only one lower court espousing the minority view. *In re Aerobox Composite Structures, LLC*, 373 B.R. 135 (Bankr. D. New Mexico 2007)(applying the actual test).

Agreements.  BKC submits that these non-monetary defaults are historical and incurable, and as

a result, the Debtors do not have the ability to assume the Franchise Agreements without BKC's

consent pursuant to 11 U.S.C. § 365(b)(1)(A).

43.     Specifically, Section 365(b)(1)(A) of the Bankruptcy Code provides, in part, as

follows:

> If there has been a default in an executory contract or unexpired
> lease of the debtor, the trustee may not assume such contract or
> lease unless, at the time of assumption of such contract or lease,
> the trustee –
>
> (A) cures, or provides adequate assurance that the trustee will
> promptly cure, such default other than a default that is a breach of
> a provision relating to the satisfaction of any provision (other than
> a penalty rate or penalty provision) relating to a default arising
> from any failure to perform nonmonetary obligations under an
> unexpired lease of real property, if it is impossible for the trustee to
> cure such default by performing nonmonetary acts at and after the
> time of assumption, except that if such default arises from a failure
> to operate in accordance with a nonresidential real property lease,
> then such default shall be cured by performance at and after the
> time of assumption in accordance with such lease, and pecuniary
> losses resulting from such default shall be compensated in
> accordance with the provisions of this paragraph;

44.     Section 365(b)(1)(A) was amended in 2005 to resolve a split in the case law as to

whether historical and incurable non-monetary defaults prevented a debtor from assuming an

executory contract.  Congress amended Section 365(b)(1)(A) to make clear that historical and

incurable non-monetary defaults would not prevent a debtor from assuming a lease of non-

residential real property.  However, such amendments did not apply to any other executory

contract, firmly establishing that the existence of historical and incurable non-monetary defaults

under any such executory contract - including franchise agreements - prevented the debtor from

assuming such contract without the express consent of the counterparty thereto.  *See In re*

*Empire Equities Capital Corp.*, 405 B.R. 687, 690-691 (Bankr. S.D.N.Y. 2009) ("In 2005

Congress revised the language of § 365(b)(2)(D) . . . making it clear that most non-monetary defaults are not exempted from the cure requirements . . . By amending § 365(b)(1)(A) only with respect to unexpired leases of real property, . . . Congress provided no room for the contention that non-monetary defaults in non-lease executory contracts are exempt from the cure obligation"); *In re Matter of Gretter Autoland, Inc.*, 2015 WL 4915802 (Bankr. S.D. Iowa) (Debtor could not assume and assign Ford and GM franchise agreements due to the existence of incurable non-monetary defaults); *In re Escarent Entities, L.P.*, 2011 WL 1659512 *465 (5th Cir. 2011) ("It follows that if a default is incurable, assumption is necessarily precluded by the plain meaning of § 365"); *In re Eagle Creek Subdivision, LLC*, 397 B.R. 758 (Bankr. E.D.N.C. 2008) (Debtor's failure to complete development of real estate by a date certain was a material, non-monetary uncurable default, resulting in inability to assume contract); *In re Williams,* 299 B.R. 684 (Bankr.S.D.Ga.2003) (debtor's use of a leased truck inconsistent with its terms was a historical fact that could not be altered, resulting in the inability to cure the non-monetary default and assumption of the lease); *In re Claremont Acquisition Corp., Inc.*, 113 F.3d 1029 (9th Cir, 1997) (franchisee's failure to operate dealership for two weeks was a non-monetary uncurable default, resulting in inability to assume franchise agreement).

45.    As a result, because incurable non-monetary defaults exist (as outlined below), the Debtors are not able to assume the Franchise Agreements without the consent of BKC.

b.    **Non-Monetary Defaults under the Franchise Agreements**

i.    **The Managing Owner Requirement and Incurable Default**

46.    In addition to the significant monetary defaults existing under the Franchise Agreements outline above, the Debtors are currently in material default of several non-monetary terms of the Franchise Agreements, which BKC submits are incurable.

47.     In particular, each Franchise Agreement contains explicit requirements concerning the organizational structure of the franchisee, as well as the designation of a "Managing Owner" approved by BKC, which Managing Owner is to have the authority to bind the Debtors in any dealings with BKC and to ensure compliance with the Franchise Agreements and any other agreements relating to the Restaurants.  In each Franchise Agreement, the Debtors also warrant that they will (a) take no action to avoid the authority requirement for the Managing Owner, or (b) make no change in the Managing Owner without the prior written consent of BKC.

48.     As set forth herein, the Debtors violated each of the Franchise Agreements prior to the Petition Date by effectively displacing the Debtors' designated Managing Owner, David A. Harper ("Harper"), with the Debtors' Chief Restructuring Officer, Mr. Winder.

49.     Article 3 of each Franchise Agreement provides:

ORGANIZATION OF FRANCHISEE

A.     The individuals listed in Exhibit B to this Agreement are the "Owners" of Franchisee for purposes of this Agreement.[14]  **Franchisee acknowledges its understanding of BKC's requirement than an individual "Managing Owner" be named and be granted the authority by Franchisee to bind Franchisee in any dealings with BKC and its affiliates and to direct any action necessary to ensure compliance with this Agreement and any other agreements relating to the Franchised Restaurant.  Franchisee represents and warrants that the Managing Owner designated in Exhibit B presently has and will have, throughout the term of this Agreement, the authority to bind Franchisee in any dealings with BKC and its affiliates and to direct any action necessary to ensure compliance with this Agreement and any other agreements relating to the Franchised Restaurant.  Franchisee has not taken and agrees that it will not hereafter take, whether directly or indirectly, any action to avoid the authority requirement for the Managing Owner through the entry of**

_____

[14] Each of the current versions of the Franchise Agreements provide that David A. Harper is the Managing Owner of the respective Debtor as Franchisee.

**limiting board resolutions, management agreements, amendment of governing documents or any other similar device or arrangement**.  Franchisee agrees to furnish BKC with such evidence as BKC may request from time to time for the purpose of assuring BKC that the Managing Owner's authority remains as represented in this Agreement.  **No change in the Managing Owner may be made without the prior written consent of BKC.**  If the Managing Owner dies or becomes incapacitated, then within sixty (60) days thereafter, Franchisee shall name a new Managing Owner approved by BKC pursuant to BKC's then current criteria for approving Managing Owners.

B.      Franchisee shall notify BKC of, and at BKC's request provide copies of, any amendments to the articles of incorporation, by-laws, partnership agreement, or any other governing documents of Franchisee.  No amendment to such governing documents may be made, nor may any resolution be adopted by the board of directors of Franchisee, if Franchisee is a corporation, without the written consent of any authorized officer of BKC, if such amendment or resolution would . . . (2) change the designation of, or the procedures for designating, the Managing Owner; (3) **change the authority delegated to the Managing Owner**; or (4) materially alter promises or representations contained in the Franchise Entity Application approved by BKC.

*See* Franchise Agreement, Ex. A., ¶ 3 (emphasis added).[15]

50.      BKC recently learned that Harper is no longer involved in the business affairs of the Debtors and has not been for some time.  Moreover, in the *Declaration of James Winder in Support of First Day Relief* [ECF No. 25], Winder states that he is "the Managing Member, Board Member, and Chief Restructuring Officer of [the Debtors]."  *Id.*  Para 1.  Mr. Winder further acknowledges that Mr. Harper ". . . **was** the managing owner as of the date of the applicable franchise agreement."  *Id.*  Para 13 (emphasis added).

---

[15] The Managing Owner is also required to undergo certain initial and continued training as provided for in the Franchise Agreement.  *See* Franchise Agreement, Ex. A., ¶ 8A.  BKC believes that that Mr. Winder has not participated in any such training programs.  Moreover, Mr. Winder has not personally guaranteed the obligations to BKC under the Franchise Agreements as required for a Managing Owner.

51.     Notwithstanding this, BKC understands that Mr. Winder has effectively replaced Harper as the Managing Owner without BKC's consent, and now holds himself out as the person with the authority ". . . to bind Franchisee in any dealings with BKC and its affiliates and to direct any action necessary to ensure compliance with this Agreement and any other agreements relating to the Franchised Restaurant."

52.     As such, the Debtors are in material non-monetary default of Article 3 of each Franchise Agreement.  BKC asserts that this default is not curable, since, among other things, it is historical and BKC does not consent to the designation of Mr. Winder as Managing Owner of any of the Debtors under the Franchise Agreements.

### ii.     Other Incurable Non-Monetary Defaults

53.     In addition, other non-monetary incurable defaults exist under many of the individual Franchise Agreements.  For example, the Debtors are operating without an operative Franchise Agreement for Restaurant Nos. 3496, 12389 and 14134 in Minnesota because those Restaurants were the subject of Limited License Agreements which, post-petition, expired on their own terms on March 31, 2023.

54.     Still further, the Debtors failed to comply with remodeling requirements for Restaurant Nos. 2982, 3428 and 7061, which were required to be remodeled prior to the Petition Date.  These remodel defaults are not subject to being cured since the respective deadlines to complete such remodels have passed.[16]  Moreover there are equipment defaults with respect to

---

[16] In addition, there are three restaurants that have a pending remodel deadline of December 31, 2023.

numerous other Restaurants (forty (40) Restaurants are missing Outdoor Digital Menu Boards, and fifty (50) Restaurants are missing Hoppers).[17]

55.    Based on the foregoing, the Debtors do not have the ability to assume the Franchise Agreements without BKC's consent.  BKC is not willing to waive such incurable non-monetary defaults under the Franchise Agreements in the context of a plan of reorganization proposed by the Debtors that does not provide for a marketing and sale of the Debtors' Restaurants in a manner acceptable to BKC.

**C.    The Franchise Agreements Cannot Be Assumed and Assigned in Connection With a Sale Process without BKC's Consent**

56.    The Franchise Agreements may not be assumed and assigned in connection with a sale process without BKC's consent based on Section 365(c)(1) of the Bankruptcy Code and federal trademark law, including the Lanham Act.  BKC has a number of rights under the Franchise Agreements, including, most critically, BKC's consent and approval rights, which are subject to BKC's sole judgment by the express terms of the Franchise Agreements.[18]  These consent/approval rights extend not only to the proposed franchisee buyer, but also to the key elements of the transaction: size of portfolio, geographic location, financial assurances, key personnel, and more. The approval of any particular transaction depends upon a number of factors, including: (a) whether the proposed purchaser has been pre-approved in accordance with the BKC's Franchisee Approval Process described above, including, but not limited to,

---

[17]The "Hopper" is a type of oven designed to quickly heat BURGER KING® products so that every menu item is served at the optimal temperature.

[18] Section 15 of each Franchise Agreement dealing with restrictions on transfer provides, among other things, that the Franchise Agreement cannot be sold and transferred unless and until: "the transferee (or, if applicable, such owners of the transferee as BKC may request), *in BKC's sole judgment*, satisfies all of BKC's business standards and requirements …." *See* Franchise Agreement, Ex. A., ¶ 15(F)(3).

completing a background check, (b) the volume and complexity of modifications required to the standard form of franchise agreement, including whether the purchaser's capital structure entails passive investor concepts, and non-competition modifications, among others, and (c) the number of locations involved, including the impact on the proposed purchaser's existing portfolio of restaurants.

57.     Generally, provisions in an executory contract or unexpired lease which restrict a debtor's ability to assign are rendered unenforceable by section 365(f)(1) of the Bankruptcy Code.  However, the situation is different in the case at bar where there is a license of protected intellectual property.

58.     It is well settled that federal trademark law, including the Lanham Act, constitutes applicable law under section 365(c) that would excuse BKC from accepting performance under the Franchise Agreements from a third party without BKC's consent.  *In re Wellington Vision, Inc.*, 364 B.R. 129, 134-37 (S.D. Fla. 2007) ("The [franchise] agreement in this case clearly granted [the debtor] a license to use trademarks belonging to [the franchisor], and therefore the Lanham Act is the 'applicable law' by which the exception to assumption and assignment is triggered via section 365(c)."); *In re Rupari Holding Corp.*, 573 B.R. 111, 117 (Bankr. D. Del. 2017); *In re The Travelot Co.*, 286 B.R. 447 (Bankr. S.D. Ga. 2002) (holding that federal trademark law, as set forth in the Lanham Act, qualifies as appliable law under section 365(c)(1)).  That is because federal trademark law provides that "a licensor who grants a non-exclusive license for the use of its trademark is entitled to certain protections, including restrictions on assignment." *Rupari*, 573 B.R. at 117. "In other words, federal trademark law generally bans assignment of trademark licenses absent the licensor's consent because, in order to ensure that all products bearing its trademark of uniform quality, the identity of the licensee is

crucially important to the licensor." *Id.* Thus, courts read § 365(c) in conjunction with the assignment restrictions of the Lanham Act to hold that a debtor-licensee may not assume or assign "a franchise agreement without [the franchisor's] consent." *Wellington*, 364 B.R. at 134, 136.

59.     Here, the Franchise Agreements grant the Debtors the right to use BURGER KING® Marks solely in connection with the Debtors' operation of the Restaurants that are the subject of the Franchise Agreements. *See* Franchise Agreement, Ex. A, at 36, ¶ 1 (granting Debtor a franchise to use BURGER KING® System and the BURGER KING® Marks solely in connection with the operation of the franchised location).  It is beyond dispute that the Franchise Agreements grant the Debtors a license to use the BURGER KING® Marks that are owned and licensed by BKC.  Therefore, the Debtors (including through the Committee's sale process or plan) cannot assume and assign the Franchise Agreements without BKC's express consent.

## CONCLUSION

WHEREFORE, BKC respectfully requests that the Court sustain this Joinder, grant the Motion to Terminate subject to the foregoing reservation of rights, and grant such other and further relief as the Court deems necessary.

Dated:  June 13, 2023

*/s/ J. Thomas Beckett*
J. Thomas Beckett
**PARSONS BEHLE & LATIMER**

Glenn D. Moses *(Admitted Pro Hac Vice)*
Paul J. Battista *(Admitted Pro Hac Vice)*
**VENABLE, LLP**

*Counsel for Burger King Company, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that on this 13th day of June, 2023, I electronically filed the foregoing **JOINDER OF BURGER KING COMPANY LLC IN THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER TERMINATING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES AND GENERAL RESERVATION OF RIGHTS** with the United States Bankruptcy Court for the District of Utah by using the CM/ECF system. I further certify that the parties of record in this case, as identified below, are registered CM/ECF users:

- **Michael R. Johnson    mjohnson@rqn.com, docket@rqn.com;ASanchez@rqn.com**

- **Peter J. Kuhn    Peter.J.Kuhn@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Armstrong@usdoj.gov;Brittany.Eichorn@usdoj.gov**

- **James T. Markus    jmarkus@MarkusWilliams.com, sschaefer@markuswilliams.com**

- **David W. Newman tr    david.w.newman@usdoj.gov, Lindsey.Huston@usdoj.gov;James.Gee@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Armstrong@usdoj.gov;Brittany.Eichorn@usdoj.gov**

- **United States Trustee    USTPRegion19.SK.ECF@usdoj.gov**

**Manual Notice List**

The following is the list of **parties** who are **not** on the list to receive email notice/service for this case (who therefore require manual noticing/service.

No manual recipients.

/s/ J. Thomas Beckett